Gerald BOURGET, Plaintiff-Appellee,

and

Security Insurance Company of Hartford, Inc., Intervening Plaintiff-Appellee,

v.

GOVERNMENT EMPLOYEES INSUR-ANCE COMPANY, Defendant-Appellant.

No. 380, Docket 35507.

United States Court of Appeals, Second Circuit.

Argued Jan. 4, 1972.

Decided Feb. 22, 1972.

Stephen Duke, New Haven, Conn., for appellee.

Peter C. Dorsey, New Haven, Conn. (Flanagan, Dorsey & Flanagan, New Haven, Conn., of counsel), for intervening-appellee.

Curtiss K. Thompson, New Haven Conn. (Thompson, Weir & Barclay, New Haven, Conn., of counsel), for appellant.

Before FRIENDLY, Chief Judge, MOORE and OAKES, Circuit Judges.

FRIENDLY, Chief Judge:

In this diversity action we are called upon to predict what result the Supreme Court of Connecticut would reach under a provision in a statute of that state, now Title 38, § 38–175, of the General Statutes,[1] enacted in 1919, which has previously been construed in this context in only one reported case, and that in a federal court. Turgeon v. Shelby Mutual Plate Glass & Cas. Co., 112 F.Supp. 355 (D.Conn.1953) (Smith, then D.J.). Although the parties have favored us with liberal quotations from Connecticut opinions on other problems of liability insurance, none throws any real light on the matter here at issue.

This action stems from a collision, in Connecticut, on March 18, 1965, between a tractor-trailer being driven by plaintiff Bourget, a resident of Massachusetts, for his employer, Branch Motor Express Company, and a passenger car owned and operated by Oren Thompson, a resident of Connecticut. Bourget was injured; Thompson was killed and his car was destroyed. There appears to have been no doubt that Thompson was solely at fault. Thompson was insured by defendant, Government Employees' Insurance Company (GEICO), a District of Columbia corporation having its principal place of business there, under a standard liability policy with a personal injury limit of $20,000.

On May 27, 1965, an inventory of Thompson's estate was filed in a Connecticut probate court. The sole asset was $2,275, representing the proceeds of the insurance on his car. The administrative account filed on December 6, 1968, and accepted by the court, after public notice, on December 11, 1968, showed the payment of claims of $129.63 and of $947.02 for funeral, probate and legal expenses, the latter of which were entitled to priority, see Bennett v. Ives, 30 Conn. 329, 335 (1862); Conn.Gen. Stat. § 45–229, and of $1,198.15 to his widow, Patricia Thompson, for her support as a widow's allowance, which was also entitled to priority. See Barnum v. Boughton, 55 Conn. 117, 10 A. 514 (1887); Conn.Gen.Stat. § 45–250. The

---

1. Sec. 38–175. *Liability of insurer under liability policy.* Each insurance company which issues a policy to any person, firm or corporation, insuring against loss or damage on account of a bodily injury or death by accident of any person, or damage to the property of any person, for which loss or damage such person, firm or corporation is legally responsible, shall, whenever a loss occurs under such policy, become absolutely liable, and the payment of such loss shall not depend upon the satisfaction by the assured of a final judgment against him for loss, damage or death occasioned by such casualty. No such contract of insurance shall be canceled or annulled by any agreement between the insurance company and the assured after the assured has become responsible for such loss or damage, and any such cancellation or annulment shall be void. Upon the recovery of a final judgment against any person, firm or corporation by any person, including administrators or executors, for loss or damage on account of bodily injury or death or damage to property, if the defendant in such action was insured against such loss or damage at the time when the right of action arose and if such judgment is not satisfied within thirty days after the date when it was rendered, such judgment creditor shall be subrogated to all the rights of the defendant and shall have a right of action against the insurer to the same extent that the defendant in such action could have enforced his claim against such insurer had such defendant paid such judgment.

account stated there was no property available for distribution. Although there is no specific indication in the record, the estate appears to have been settled under the simplified procedure provided by § 45–230 of the Connecticut General Statutes for insolvent estates.[2]

On September 20, 1965, Bourget elected to receive workmen's compensation benefits, under governing Massachusetts law, from his employer's liability insurer, Security Insurance Company of Hartford, Inc. (Security), a Connecticut corporation. The agreement provided for compensation benefits of $53 per week for Bourget and of $36 per week for his dependents. The benefits were to continue as long as Bourget remained partially disabled and, in the case of the latter payments, so long as the dependency continued. Security also agreed to pay the costs of any litigation brought by Bourget.

On October 1, 1965, Bourget filed an action in the District Court for Connecticut against Mrs. Thompson as administratrix, seeking compensatory damages of $150,000.00 and exemplary damages of $50,000. He was represented by the firm of Lynch & Traub under an arrangement for a contingent fee of 33⅓% of the gross amount of any recovery. Pursuant to its policy obligations, GEICO retained counsel, Morris Tyler, Esq., to defend the action on the estate's behalf and notified Mrs. Thompson that since the complaint was in excess of the policy limits, she had the right to hire her own counsel for the estate. She declined to do so. GEICO's investigation led it to conclude that Bourget was substantially overstating his injuries from the collision, some of which, in its view, were the result of a 1961 accident

and others of which it believed not to exist at all. Although Judge Zampano, who was to preside at the trial, suggested at a pre-trial conference that GEICO would be well advised to settle for the policy limit of $20,000 less a small saving and Bourget's counsel was prepared to compromise in that area, the highest settlement offer GEICO's counsel ever transmitted was $12,500. The jury rendered a verdict for $94,900; judgment was entered for that sum plus costs of $442.65. GEICO paid Bourget $20,000; up to the time of trial, Security had paid Bourget some $16,225 in benefits and it received $9,606.94 from the payment made by GEICO.

After a demand that the administratrix pay the balance of $75,342.65, which met with the response that might have been anticipated, Bourget brought an action in the District Court for Connecticut against GEICO for that sum, avowedly pursuant to the last sentence of § 38–175, see note 1. The district court granted a motion to join Security as a plaintiff. Later it refused to dismiss the action on various grounds urged by GEICO, 313 F.Supp. 367 (D. Conn.1970). Although GEICO insists that it was justified in refusing to meet Bourget's terms for settlement, we accept that the evidence was sufficient to take the case to the jury if GEICO owed Thompson's estate the duty generally imposed upon liability insurers, whether this be phrased in terms of *good faith* or of *due care*. See R. Keeton, Liability Insurance and Responsibility for Settlement, 67 Harv.L.Rev. 1136, 1139–42 (1954); 7A Appleman, Insurance Law and Practice §§ 4712, 4713 (1962). However, there was no such

2. When it appears to the court of probate that the assets of the estate of any deceased person in settlement before such court, exclusive of the articles which may be legally set out to the widow and the allowance for her support and that of the family of the deceased, will not be more than sufficient to pay the funeral expenses, the expenses of settling the estate, the expenses of the last sickness and the law-

ful taxes and debts due the state and the United States, the court may, after notice to all persons interested to appear, upon hearing, ascertain the amount of the funeral and other expenses and of such taxes and preferred debts, and decree that the settlement of such estate be completed without the appointment of commissioners.

duty under the unusual circumstances of this case.

■■ The basis for judicial imposition on liability insurers of a duty to exercise good faith or due care with respect to opportunities to settle within the policy limits "is that the company has exclusive control over the decision concerning settlement within policy coverage, and company and insured often have conflicting interests as to whether settlement should be made . . ." Keeton, *supra*, 67 Harv.L.Rev. at 1138; Harris v. Standard Accident and Ins. Co., 297 F.2d 627, 630 (2 Cir. 1961), cert. denied, 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed 847 (1962). Whether one considers the insured's claim to sound in tort, as most of the cases have, see Keeton, *supra*, 67 Harv.L.Rev. at 1138 n.5, or as based on an expansive reading of the contractual obligation to protect up to the agreed limits, see Comunale v. Traders & General Insurance Co., 50 Cal.2d 654, 328 P.2d 198 (1958); Terrell v. Western Casualty & Surety Co., 427 S.W.2d 825 (Ky.1968), what gives rise to the duty and measures its extent is the conflict between the insurer's interest to pay less than the policy limits and the insured's interest not to suffer liability for any judgment exceeding them. In the rare instance where the insured has no such interest, there can be no conflict and the duty does not arise. Such was our holding in Harris v. Standard Accident and Ins. Co., *supra*.

Contrast Young v. American Casualty Co. of Reading, 416 F.2d 906 (2 Cir. 1969), petition for cert. dismissed pursuant to Rule 60, 396 U.S. 997, 90 S.Ct. 580, 24 L.Ed.2d 490 (1970).

■ There could scarcely be a case where the insured's lack of interest in avoiding a judgment exceeding the policy limits was as clear as this one. Thompson had no assets at all except his car. The insurance proceeds on this were completely consumed by claims to which Connecticut gave priority over Bourget's,[3] Barnum v. Boughton, 55 Conn. 117, 10 A. 514 (1887) (widow's allowance not attachable); Bennett v. Ives, 30 Conn. 329, 335 (1862) (expenses for funeral and settlement of estate rank before other debts of estate); see Conn.Gen.Stat. §§ 45–229, 45–230, 45–250. Satisfaction of Bourget's claim was thus unnecessary to pass even a small amount to Thompson's heirs. Counsel's suggestion that some asset now unknown might fall into the estate at some future time ignores reality.[4] Since Thompson was killed, the threat of a judgment hanging over him was nil.

We recognize that in Lee v. Nationwide Mutual Ins. Co., 286 F.2d 295, 296 (4 Cir. 1961) (Maryland law), the court spoke of "the utter irrelevance of the death to the insurer's tort, which was committed by the insurer long after the insured's death, with absolutely no connection between the two."[5] However,

---

3. While this may not be true with respect to the undescribed claim for $129.63, the widow's allowance would simply have been increased if it had not existed.

4. There was testimony that Thompson had six or seven brothers and sisters still living, and that his parents were "very, very poor." However, even if we were to assume that their financial condition might improve and that they had made wills naming Thompson as a beneficiary, the gift would go to Thompson's issue, Conn. Gen.Stat., § 45–176, not to his estate. See 6 Page, Wills § 50.12 at 85 (1962).

5. See also Henke v. Iowa Home Mutual Casualty Company, 250 Iowa 1123, 97 N.W.2d 168, 171 (1959); Sweeten v. National Mutual Insurance Co., 233 Md. 52,

194 A.2d 817 (1963); Chitty v. State Farm Mutual Auto. Ins. Co., 38 F.R.D. 37 (E.D.S.C.1965) (South Carolina law); Wolfberg v. Prudence Mutual Casualty Company, 98 Ill.App.2d 190, 240 N.E.2d 176 (1968); State Farm Mutual Auto. Insurance Company v. Brewer, 406 F.2d 610, 613, 614 (9 Cir. 1968) (Oregon law). The rationale of the above decisions is that since, in most jurisdictions, an insolvent individual need neither prepay nor demonstrate an ability to pay the excess judgment before suing his insurance company, no prepayment requirement should be placed on an insolvent estate. However, the rationale behind the "no prepayment" rule, *see e. g.*, Gray v. Nationwide Mutual Ins. Co., 422 Pa. 500, 223 A.2d 8, 10 (1966), has no applicability

that case differed in that the estate had assets of $1,144.48, which would have been distributable but for the injured party's judgment, see 184 F.Supp. 634, 637 (D.Md.1960). We cannot agree that the death of the insured is irrelevant "to the insurer's tort" in a case where, by removing the possibility of damage, it has destroyed all basis for an insurer's liability, whether in tort or in contract; it is thus quite irrelevant that the insurer's conduct occurred "long after the insured's death." Since under the unusual facts of this case, there was no possible conflict of interest between the insurer and the insured, there is no basis of imposing a duty on the former as a matter of common law. Moreover, the approach in the *Lee* case runs counter to the rationale of our *Harris* decision, see 297 F.2d at 630–635, which we continue to find persuasive, and which we must follow unless the final sentence of the Connecticut statute § 38–175, requires otherwise.

The parties have engaged in extensive debate as to whether the final sentence has any application to claims for failure to exercise good faith with respect to settlement. GEICO argues with some force that the last sentence of the section deals only with the type of liability described in the first, which obviously is confined to the policy limits. It buttresses this argument with the point that in 1919 there was little law on the insurer's duty to settle and it is thus

hardly conceivable that the 1919 legislature was directing its mind to this.[6] However, for present purposes, we are willing to accept Judge Smith's conclusion in Turgeon v. Shelby Mutual Plate Glass & Cas. Co., 112 F.Supp. 355 (1953), that the final sentence of § 38–175 would cover the usual cases of a living insured who, for one reason or another, had not paid the excess judgment, or of the estate of an insured with assets the transmission of which to legatees or next of kin depended upon such payment.[7] The first portion of the operative portion of the last sentence, "such judgment creditor shall be subrogated to all the rights of the defendant" does not assist the plaintiffs if, as we have held, the defendant had none. Plaintiffs' case thus depends upon reading the words "and shall have a right of action against the insurer to the same extent that the defendant in such action could have enforced his claim against such insurer had such defendant paid such judgment" as meaning not merely that payment was not required but that the judgment creditor could recover, *by way of subrogation*, when the defendant (here Thompson's estate) could not pay, never would be able to pay, and could suffer no damage from failure to pay. This would place altogether too much weight on the strict letter of what the 1919 legislature said and too little on the problem to which the statute was

---

to an insolvent estate since the adverse judgment can do it no harm. Thus, while we do not say that Connecticut would require an estate to prepay an excess judgment before suing its insurer, we do predict it would hold that an estate must demonstrate it has been damaged in some manner.

6. Appellees seek to counter this with the argument that the statute was reenacted in 1929 when it was ascertained that the 1919 statute was invalid because it had not been signed within three days after adjournment of the Legislature and that in that very year an article on the subject had appeared in Connecticut. See Baldwin, Liability of an Insurer for Failure to Settle, 3 Conn.Bar.J. 114 (1929). The

1929 reenactment is of little significance. It was apparently one of several bills that had to be adopted at the same time for the same reason; the 1929 legislature simply endorsed whatever the 1919 legislature had meant.

7. GEICO contends that the force of *Turgeon*, which merely denied a motion for summary judgment, is impaired because, in denying a motion for reargument presenting legislative history concerning the 1919 enactment, Judge Smith said that this could be considered after defendant had answered. Because of a settlement, such consideration did not occur. We do not find the legislative history compelling in GEICO's favor so far as the usual case is concerned.

addressed.[8]  See Lee v. Lee, 145 Conn. 355, 358, 143 A.2d 154, 155–156 (1958); Rich v. Dixon, 153 Conn. 52, 57, 212 A. 2d 417, 419 (1965); Diskin v. Lomasney & Co., 452 F.2d 871, 874 (2 Cir. 1971).

Little need be written with respect to plaintiffs' suggestion that, even absent the statute, they are entitled to sue for the excess judgment in their own right or by subrogation to the rights of the insured. The decisions have been practically unanimous in following Professor Keeton's statement, *supra*, 67 Harv.L. Rev. at 1176:

> The excess liability of company arises out of the relationship between insured and company. Claimant is a stranger to that relationship.

See, e. g., Tabben v. Ohio Casualty Ins. Co., 250 F.Supp. 853 (E.D.Ky.1966) (Kentucky law); Chittick v. State Farm Mutual Auto Ins. Co., 170 F.Supp. 276 (D.Del.1958) (Delaware law); Ammerman v. Farmers Insurance Exchange, 19 Utah 2d 261, 430 P.2d 576, 578 (1967); Biasi v. Allstate Ins. Co., 104 N.J.Super.

155, 249 A.2d 18, 20–21 (1969); Duncan v. Lumbermen's Mutual Cas. Co., 91 N. H. 349, 23 A.2d 325, 326 (1941); Yelm v. Country Mutual Ins. Co., 123 Ill.App. 2d 401, 259 N.E.2d 83, 84 (1970). The dictum in Bartlett v. Travelers' Ins. Co., 117 Conn. 147, 167 A. 180, 184 (1933), that an insurer may be under a duty to exercise fairness in settlement of multiple claims within the policy limits is wholly insufficient to show that Connecticut would set itself against the rule generally recognized in the absence of a statute clearly so providing.[9]

The judgment is therefore reversed with instructions to dismiss the complaint.

OAKES, Circuit Judge (dissenting):

I dissent. The majority opinion here expands upon and applies to Connecticut a decision that involved only the law of New York,[1] that has been sharply limited by this and other courts[2] and criticized to some extent by the commentators,[3] and that was in my view based

---

8. For a discussion of the problems that § 38–175 was intended to remedy, see Guerin v. Indemnity Ins. Co., 107 Conn. 649, 142 A. 268 (1928).

9. We recognize that some courts have permitted the insured to assign his claim against his insurance company to the injured judgment creditor. See, e. g., General Accident Fire & Life Assurance Corp. v. Little, 103 Ariz. 435, 443 P.2d 690 (1968). However, where, as here, the insured has suffered no damage and has no claim against the company in its own right, no "assignment" would aid the plaintiff.

1. Harris v. Standard Acc. & Ins. Co., 297 F.2d 627, 630 (2d Cir. 1961) (2–1 decision), cert. denied, 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed.2d 847 (1962) (where assured insolvent before and bankrupt after entry of judgment, suit for recovery of excess over policy limits will not lie).

2. Young v. American Cas. Co., 416 F.2d 906 (2d Cir. 1969), petition for cert. dismissed, 396 U.S. 997, 90 S.Ct. 580, 24 L. Ed.2d 499 (1970) (*Harris* inapplicable if insured not insolvent at time of settlement negotiations); Anderson v. St. Paul Mercury Indem. Co., 340 F.2d 406, 409 (7th Cir. 1965); Jessen v. O'Daniel, 210 F.Supp. 317, 329–330 (D.Mont.1962),

aff'd sub nom. National Farmers Union Prop. & Cas. Co. v. O'Daniel, 9 Cir., 329 F.2d 60 (1964); Nichols v. United States Fid. & Guar. Co., 37 Wis.2d 238, 155 N.W.2d 104 (1967). *See also* Brockstein v. Nationwide Mut. Ins. Co., 417 F.2d 703 (2d Cir. 1969).

3. 7A J. Appleman, Insurance Law and Practice § 4711, at 207 (Supp.1970), *says as to the majority opinion in Harris v. Standard Acc. & Ins. Co., 297 F.2d 627 (2d Cir. 1961) (2–1 decision), cert. denied, 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed. 2d 847 (1962):*

> This decision is subject to criticism for the following reasons: The assumption that the insured suffered no loss is contrary to fact. Although the New York statute [prohibiting use of assured's insolvency as defense] is keyed to policy limits, the court disregards the fact that the insurer's conduct in refusing in bad faith to settle within policy limits is a breach of contract, and the promise to settle constitutes part of the coverage protected by the statute. Finally it opens a new avenue for driving down the amount of a proposed settlement without additional risk to the insurer.

*See also* 60 Mich.L.Rev. 517 (1962); 41 Texas L.Rev. 595 (1963). Essentially neutral on this point were 62 Colum.L.

on unsound and insufficient premises. Reversing the decision of a trial judge well-versed in Connecticut law, the majority opinion runs counter to Connecticut legislative policy [4] aimed at promoting good faith in the conduct of settlement negotiations by a liability insurer, a policy aimed not only at protecting assureds but also at fostering the prompt and fair disposition of liability claims. *Cf.* Bartlett v. Travelers' Insurance Co., 117 Conn. 147, 157, 167 A. 180, 184 (1933).

I say that in my view *Harris* was based on unsound premises, as Judge Smith's dissent pointed out, 297 F.2d at 638, not only because the pendency of the action might have affected the assured's credit, since the refusal to settle in *Harris* occurred four months before insolvency, but also because *Harris* opens the door to using the shaky financial condition of an insured as a device for driving down settlements. I add that *Harris's* premises were insufficient because there is a strong public interest in spreading the burden of caring for the injured, Note, Direct Action Statutes: Their Operational and Conflict-of-Law Problems, 74 Harv.L.Rev. 357 (1960), and a real social and judicial interest in promoting good faith settlement negotiations,[5] interests which the majority in *Harris* and here, it seems to me, overlook.

But we are not here concerned simply with the underlying rationale of *Harris*, since it involved New York law—decided, incidentally, when a negligent failure to settle was not actionable and when no New York court had found evidence of bad faith sufficient to impose liability upon an insurer. 30 Fordham L.Rev. 188, 192 (1961). The majority extends *Harris* to Connecticut, where the statute reads, " . . . such judgment creditor . . . shall have a right of action against the insurer to the same extent that the defendant in such action could have enforced his claim against such insurer *had such defendant paid such judgment*." [Emphasis supplied.]

The majority relies upon a quoted excerpt from an article by Professor Robert Keeton, stating that the claimant is "a stranger" to the relationship between an insured and his company. R. Keeton, Liability Insurance and Responsibility for Settlement, 67 Harv.L.Rev. 1136, 1176 (1954). The inapplicability of the quoted excerpt to this case can be seen, however, only by evaluating the statement in its full context. The second sentence preceding the excerpt reads: "Some policies have contained a provision that claimant, after writ of execution against insured is returned unsatisfied, may recover against company *to the same extent as could insured if he had paid the judgment*; such provision has been construed as applying to the recovery to which insured would have been entitled under the doctrine of excess liability." 67 Harv.L.Rev. at 1175.[6] The sec-

---

Rev. 896 (1962) and 30 Fordham L.Rev. 188 (1961).

4. Conn.Gen.Stat. § 38–175 is quoted in full in the majority opinion (note 1 of that opinion). I would emphasize the last clause, however: " . . . and shall have a right of action against the insurer to the same extent that the defendant in such action could have enforced his claim against such insurer *had such defendant paid such judgment*." [Emphasis supplied.] The statute reads "paid such judgment." It does not read "been able to pay such judgment (or a portion thereof) at the time such judgment is entered," as the majority construes it.

5. *See* Traders & Gen. Ins. Co. v. Rudco Oil & Gas Co., 129 F.2d 621 (10th Cir. 1942); Employers Mut. Cas. Co. v. Chicago, St. P., M. & O. Ry., 235 Minn. 304, 50 N.W. 2d 689 (1952).

6. The emphasis is Professor Keeton's; the cases he cites are Kleinschmit v. Farmers Mut. Hail Ins. Ass'n, 101 F.2d 987 (8th Cir. 1939), and Auto Mut. Indem. Co. v. Shaw, 134 Fla. 815, 184 So. 852 (1938). Keeton goes on to add that the typical policy "now in use" does not contain such a provision, but he does not mention statutes to the same effect, as here.

ond sentence following the majority's Keeton excerpt reads: "It would therefore be anomalous to permit claimant to recover directly against company in his own right (in the absence of a policy provision, such as the italicized phrase above, clearly having that meaning)." 67 Harv.L.Rev. at 1176.

I fail to see any difference between Professor Keeton's policy provision that is his own exception to the rule on which the majority opinion here is based, on the one hand, and the Connecticut statute just above quoted, on the other. Further, I find nothing in the Connecticut cases cited in the majority opinion which calls for any reading of the statute other than that given it by the court below, or that given to it by then District Judge Smith in Turgeon v. Shelby Mutual Plate Glass & Cas. Co., 112 F.Supp. 355 (D.Conn.1953). Indeed, the cases cited by Professor Keeton, note 6 *supra*, construing the same provision appearing in insurance policies, are further support for this reading of the statute.

The fortuitous and to my mind irrelevant death of the assured is held by the majority to permit an insurer to conduct settlement negotiations in bad faith, on the basis that the assured's estate was so small that his widow's allowance and funeral expense could have consumed it.

The majority has forged a rule of law that makes the insurer's duty turn on the wealth or poverty and the survival of the assured. This rule is further refined—by the decision in Young v. American Casualty Co., note 2 *supra*—so that if the deceased assured had had one dollar over priority items available for his heirs the plaintiff would have been entitled to recover the excess of his judgment over the policy limits, some $75,000. Such a rule might give incentive to insurers to write limited policies for the financially irresponsible, but it appears to me to be an anomaly.

I would affirm the judgment.