Juanita **PETERSON**, Individually and as Assignee of Nathaniel Washington, Plaintiff-Appellee,

v.

**ALLCITY INSURANCE COMPANY,** Defendant-Appellant.

No. 29, Docket 71-1402.

United States Court of Appeals, Second Circuit.

Argued Oct. 4, 1972.

Decided Dec. 29, 1972.

Philip Hoffer, New York City (Rose L. Hoffer, New York City, and Peter T. Affatato, Hicksville, N. Y., on the brief), for defendant-appellant.

Aaron J. Broder, New York City (Seymour Madow, New York City, on the brief, and Manuel Katz and Herbert W. Katz, New York City), for plaintiff-appellee.

Before MOORE, FEINBERG and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the Eastern District of New York entered on March 19, 1971 awarding $70,000 to the plaintiff-appellee, after a trial before Hon. Orrin G. Judd and a jury. Judgment affirmed.

The judgment appealed from involves an action brought by the assignee of an insured against a liability carrier, Allcity Insurance Company, the appellant, based upon its "bad faith" in failing to settle a claim against its insured within the limits of its liability policy. The insured, Nathaniel Washington, was driving his car with a passenger, appellee Juanita Peterson, in Queens, New York, on June 4, 1967 when the car mounted a road divider and collided with a vehicle driven by Herbert Brown who was proceeding in the opposite direction. Washington was arrested for driving while intoxicated and reckless driving. He pleaded guilty to the reckless driving charge. Washington's Allcity Insurance Company policy contained a $10,000 limitation. His passenger, Juanita Peterson, sustained severe injuries losing the sight of one eye, facial scars and the possibility of losing the sight of the other eye due to sympathetic ophthalmia. The insurer defended the negligence action brought by Juanita Peterson against Washington in the New York Supreme Court, Queens County, before Hon. Abraham J. Multer and a jury. The jury returned a verdict in favor of Miss Peterson in the sum of $80,000 and a judgment for that amount was entered on October 25, 1968. The insurer did not appeal but paid its full coverage of $10,000 plus costs. In May, 1969, Washington assigned to Miss Peterson his cause of action against Allcity for failure to settle in good faith within the policy limits. She commenced an action on the assigned claim in the Eastern

District of New York; subject matter jurisdiction was based on diversity of citizenship—Miss Peterson was alleged to then be a citizen of North Carolina and Allcity "a citizen of New York."

## I. JURISDICTION

 Appellant's first point on appeal is that Miss Peterson's domicile in North Carolina was not *bona fide* but was spuriously attained for the sole purpose of creating jurisdiction in the Federal Court. The trial court, in denying a motion to set aside the verdict on this ground, found that the plaintiff who was born in North Carolina, had returned there after the judgment was entered in the New York negligence action and credited her testimony that she intended to live there. Her father had just died there and the family farm was there. We find nothing in the record at all to suggest that she did not have the intention to make it her home. She was there without dispute at the time of the commencement of this action. The fact that she subsequently returned to Brooklyn, New York where she was living at the time of the trial is of no significance in view of the absence of any proof that the move to North Carolina was not *bona fide*. Appellant's claim that Miss Peterson moved to North Carolina solely for the purpose of obtaining diversity jurisdiction, even if it could be established, is immaterial. So long as she intended to make North Carolina her home at the time she moved there and had no intention then of moving elsewhere, her motive in moving, even if for jurisdictional purposes, is not our concern. Williamson ·v. Osenton, 232 U.S.

619, 34 S.Ct. 442, 58 L.Ed. 758 (1914); Morris v. Gilmer, 129 U.S. 315, 9 S.Ct. 289, 32 L.Ed. 690 (1889); C. Wright, Law of Federal Courts, § 26 (2d ed. 1970). Since the merits of this case are to be determined by the law of New York in any event it is highly improbable that Miss Peterson's trek was inspired by jurisdictional considerations.[1]

## II. LACK OF COOPERATION OF THE INSURED

 Appellant argues that the complaint below should have been dismissed since Washington's conduct indicated that he was totally unconcerned about the outcome of the lawsuit and that he was totally uncooperative with the insurer. It is urged that the assignee here should be estopped from complaining that the insurer acted in bad faith in failing to settle within the policy limits. The proposition that the lack of concern of the insured excuses the exercise of good faith efforts by the insurer to settle a claim against him, is not supported by authority.[2] There is, of course, ample authority that an insurance company can disclaim liability entirely and refuse to defend at all if it can "shoulder the heavy burden" of establishing that the attitude of the insured whose cooperation was sought was one of "willful and avowed obstruction." Thrasher v. United States Liab. Ins. Co., 19 N.Y.2d 159, 168, 278 N.Y.S.2d 793, 800, 225 N.E.2d 503 (1967), Coleman v. New Amsterdam Cas. Co., 247 N.Y. 271, 276, 160 N.E. 367 (1928). In this case there was never any disclaimer of liability on the part of the insurer which defended the action and paid the judgment.[3]

---

1. Appellant does not dispute that New York law applies but simply takes the position that this Circuit has misunderstood the New York law. This proposition is discussed in Part III of this opinion, infra.

2. Cf. Gordon v. Nationwide Mut. Ins. Co., 30 N.Y.2d 427, 435–436, 334 N.Y.S.2d 601, 607–608, 285 N.E.2d 849 (1972), where, after the insurance company had refused to defend, the insured defaulted

and a $259,000 verdict against him ensued. The indifference of the insured there directly created the insurer's exposure to the heavy verdict.

3. In any event disclaimer for breach of the cooperation clause must be made as soon as is reasonably possible. N.Y. Ins.Law § 167(8) (McKinney 1966); see Allstate Ins. Co. v. Gross, 27 N.Y.2d 263, 317 N.Y.S.2d 309, 265 N.E.2d 736 (1970).

■■ We are not persuaded in any case that Washington's lack of cooperation was directed at thwarting the insurance company's defense of the lawsuit. Washington was poorly educated, was living in a basement apartment and was laboring under the illusion apparently that having paid his premiums the insurance company would protect him against any losses. Moreover, the testimony of the insurer that it failed to get his cooperation was countered by his evidence that they failed to advise him of his right to seek independent counsel or of any settlement negotiations. It must also be emphasized that the insurance company's only proposed defense to the action was that Washington was a drunken driver, that Miss Peterson was aware of this when she entered the vehicle and assumed the risk. Washington consistently denied that he had been drinking and his reluctance to acknowledge this could hardly be characterized as a willful and avowed obstruction of the insurance company's defense.[4]

## III. DIRECTION OF A VERDICT FOR APPELLANT

■■ The principal emphasis of the appellant in this court is that under New York law an insurer is under no legal obligation to settle the primary tort action by offering the entire limit of coverage and therefore it was error not to direct judgment in favor of the appellant and to submit the issue to the jury for determination. This in our view is not a proper statement of the law of New York and is not at all supported by the cases in the New York Court of Appeals upon which appellant places reliance. The test, of course, is whether or not the insurer acts in *good faith* in refusing to settle within the policy limits. The mere fact that a verdict may exceed the policy limits does not mandate an offer of the policy. However, under circumstances indicating bad faith, the insurer may in fact be subject to excess liability if he fails to settle. Normally where the issues are contested as they were bitterly here, the trier of the fact under proper instructions of the court, is charged with this determination. Brochstein v. Nationwide Mut. Ins. Co., 448 F.2d 987, 990 (2d Cir. 1971), cert. denied, 405 U.S. 921, 92 S.Ct. 957, 30 L. Ed.2d 791 (1972); Brown v. United States Fidelity & Guar. Co., 314 F.2d 675, 680 (2d Cir. 1963).

Appellant relies on four New York Court of Appeals cases for the bald proposition that there is no obligation for an insurer to settle the primary tort liability by offering its entire coverage.[5] The first two cases, Auerbach v. Maryland Cas. Co., 236 N.Y. 247, 140 N.E. 577 (1923) and Best Bldg. Co. v. Employers' Liab. Assur. Corp., 247 N.Y. 451, 160 N.E. 911 (1928), were thoroughly discussed in Judge Kaufman's exhaustive opinion for this court in Brown v. United States Fidelity & Guar. Co., 314 F.2d 675 (2d Cir. 1963). While many of the early New York cases contained language that the company's power over settlement amounted to an almost unlimited discretion, short of fraud or collusion (which appellant would also except), Judge Kaufman concluded, relying on *Best*, that the "good faith" settlement standard prevailed:

Despite the absence of a clear, recent pronouncement on the subject, we are convinced that the good-faith settlement standard controls in New York in cases of an assured's personal

---

4. This fact distinguishes cases relied upon by appellant (Pipoli v. United States Fidelity & Guar. Co., 38 A.D.2d 249, 328 N.Y.S.2d 688 (1st Dep't 1972); Colbert v. Home Ind. Co., 35 A.D.2d 326, 315 N.Y.S.2d 949 (4th Dep't 1970)) which stand for the proposition that an insured is estopped from claiming the insurer acted in bad faith in refusing to settle, where the insurer's reliance upon the in-

sured's version of the facts is responsible for its conduct. Here on the contrary, the insurer rejected the insured's version of the facts.

5. It should be noted that there was conflicting testimony as to whether the insurer here ever offered more than $5000 rather than the full $10,000 policy coverage.

liability resulting from the insurer's failure to settle within policy limits. 314 F.2d at 678.

The two later Court of Appeals decisions upon which appellant relies are not only not helpful to its position but establish quite definitely that Judge Kaufman's determination of New York law was correct. Parisi v. Maryland Cas. Co., 27 N.Y.2d 505, 312 N.Y.S.2d 678, 260 N.E.2d 871 (1970), is a memorandum opinion affirming a decision of the Appellate Division, 32 A.D.2d 1030, 303 N.Y.S.2d 496 (2d Dep't 1969), which without opinion affirmed an order of Justice Miles McDonald, Supreme Court of New York, Kings Co., granting summary judgment for defendant insurance company. An examination of his opinion (160 N.Y.L.J., Nov. 26, 1968, at 18, col. 7) reveals that the insurer not only failed to settle within the policy limits but defaulted in the tort action brought against the insured. Its reason was that the policy holder had provided the carrier with a written statement that he had never been served with process in the pending action. The case does not at all stand for the proposition that the company had no legal obligation to settle within policy limits but rather held that the company was in good faith in relying on the written statement of its insured and therefore was not liable for any excess verdict. Justice McDonald, in his opinion (160 N.Y.L.J., Nov. 26, 1968 at 18, col. 8 to 19, col. 1) stated:

> The principle involved is clearly set forth in Cappano v. Phoenix Assur. Co. (28 A.D.2d 639 [280 N.Y.S.2d 695]) as follows: "As was stated in Harris v. Standard Acc. & Ins. Co. ([D.C.N.Y.] 191 F.Supp. 538, 540 [Kaufman, J.]),

cited with approval in Brown v. United States Fid. & Guar. Co. ([2 Cir.] 314 F.2d 675): Since the company, therefore, has power, through the control of settlement, to adversely affect the insured's interests, it must necessarily bear a legal responsibility for the proper exercise of that power. Thus, the law imposes upon the insurer the obligation of good faith—basically, the duty to consider, in good faith, the insured's interests as well as its own when making decisions as to settlement. Bad faith—the failure to comply with this obligation—is generally proven by evidence largely circumstantial in nature."

Gordon v. Nationwide Mut. Ins. Co., 30 N.Y.2d 427, 334 N.Y.S.2d 601, 285 N.E.2d 849 (1972), is equally devastating to appellant's position. All of the opinions in that case proceed upon the recognition that the law in New York requires that the insurer has the obligation of acting in good faith toward its insured, in considering whether or not it should settle within policy limits.[6] In *Gordon* the insurer was advised by its counsel that the insured had defaulted on his premium payment contract and that the policy had been cancelled. Relying on this advice, the carrier advised the insured that it would not defend the tort action or be responsible for resulting damage. A majority of the court considered that the company had the right to rely on the advice of counsel, was in good faith in taking this position and ordered the complaint dismissed.

■ It seems clear therefore that there is no law in New York which gives the insurer the right to cavalierly refuse

6. Bergan, J., writing the plurality opinion: "Recovery in this action . . . rests on a breach of good faith in the performance of its liability insurance contract . . . ." 30 N.Y.2d at 430, 334 N.Y.S. 2d at 603, 285 N.E.2d at 850. Fuld, Ch. J., concurring: "I agree with Judge Bergan that the record before us is devoid of any evidence that defendant Nationwide acted in bad faith and, consequently, I too am for reversal and dismissal of

the complaint." 30 N.Y.2d at 439, 334 N.Y.S.2d at 611, 285 N.E.2d at 856. Dissenting Breitel, J.: "The doctrine that a liability insurer owes a duty of good faith to protect its insured, including the good faith consideration of opportunities to settle . . . has deep roots in New York . . . ." 30 N.Y.2d at 445, 334 N.Y.S.2d at 615, 285 N.E.2d at 859 (citations omitted).

to settle within policy limits but rather that it must exercise "good faith." There was no error in refusing to direct judgment in favor of the appellant.

## IV. SUFFICIENCY OF THE EVIDENCE

While the New York rule is unquestionably that the insurer must act in good faith, in the unending variety of fact patterns which continue to plague courts in these cases, there is no pat formula which can be routinely applied to determine its presence.[7] We can do little more than repeat what Judge Judd charged the jury in substance in this case. The insurance company must give at least equal consideration to the insured's interests as to its own when making settlement decisions.[8]

We believe that there was sufficient evidence before the jury to find that the insurance company did not proceed in good faith in attempting to negotiate a settlement of this claim within policy limits. There was little question of liability in this case from the beginning. It was uncontroverted that the insured had driven over a divider and collided with a car coming in the opposite direction. He was charged with reckless driving and driving while intoxicated and he pleaded guilty to reckless driving. Although he has consistently denied being drunk, there was evidence that he had failed a drunkometer test at the police precinct. Just as negligence was clear so was the magnitude of the injuries suffered by the plaintiff. She was a 30 year old woman who as a result of the accident was permanently blinded in one eye, faced the possible loss of vision in the other eye and received severe facial scarring. She spent forty days in a hospital. There was no attempt to controvert the seriousness and permanency of her injuries and the insurer was fully apprised of the gravity of the harm she suffered. The policy coverage was $10,000 and the high probability of a verdict far in excess of the policy limit cannot be seriously questioned.

The only possible defense of the insurer was that Miss Peterson was guilty of contributory negligence in accepting a ride with a driver she had reason to believe was intoxicated.[9] Such a defense, while it may totally exculpate the defendant and the insurer, obviously may have the opposite effect. The carrier's emphasis on the culpability of the insured, may so inflame the jury that a swollen verdict may ensue. In such a case Professor Keeton suggests that the circumstances may create such a conflict of interest that this defense should not be permissible. R. Keeton, Insurance Law § 7.7(c), at 501 (1971). This question was not raised by the parties below

7. Section 40–d of the N.Y.Ins.Law (McKinney Supp.1972) catalogues unfair claim settlement practices for the first time in New York. However, the statute applies only to acts by insurers occurring after September 1, 1970. Moreover, the Governor's Memorandum approving the bill (1970 McKinney's N.Y.Sess.Laws 3091) indicates that it is intended to be applicable in administrative or judicial proceedings brought by the New York Insurance Department. It leaves to the courts the settlement of individual suits.

8. While Professor Keeton objects to this formulation of the rule and prefers that the jury be charged that the company must in good faith view the situation as it would if there were no policy limit applicable to the claim (Keeton, Liability Insurance and Responsibility for Settlement, 67 Harv.L.Rev. 1136, 1142–48 (1954)), it is doubtful that it is realistically any more helpful to the jury.

9. While the parties here, throughout the proceedings, referred to this defense as one of contributory negligence, we note that where such proof is presented, "the defense of assumption of risk and contributory negligence overlap, and are as intersecting circles, with a considerable area in common, where neither excludes the possibility of the other." W. Prosser, Law of Torts § 67, at 451 (3d ed. 1964). Since, however, our decision does not turn on whether the defense employed was technically one of assumption of the risk or contributory negligence, or both, we, for purposes of this opinion, shall accept counsel's characterization.

and was not brought to the attention of the jury. However, there was evidence from an expert witness for the insurer that a jury may well disregard evidence of contributory negligence where there are severe injuries because of their sympathy or compassion for the plaintiff.

Realistically the prospect of success of the defense in this case was highly dubious. Although Miss Peterson's hospital record indicated A.O.B. (alcohol on breath) she denied that she had been drinking or that she knew Washington had been. There was conflicting evidence as to how long she had been with him before accepting the ride. There was no evidence that Washington was obviously drunk or that his actions were such as to alert Miss Peterson to his condition.[10] See Burnell v. La Fountain, 6 A.D.2d 586, 180 N.Y.S.2d 52 (3d Dep't 1958). This does emphasize of course the question of the thoroughness of the insurer's investigation as well as the particular urgency to advise Washington of his right to independent counsel. As with most aspects of this case, these were disputed questions of fact, which were left to the jury.

When this case was placed on the state trial calendar for September, 1968, there was testimony that the company advised Miss Peterson's attorney that this was a "no pay" case and that he would offer $1000 to settle. There was no evidence of any negotiation before trial. After the selection of a jury, the insurer offered $5000. There was testimony that counsel for plaintiff was willing to take $10,000 and evidence by defendant that the offer was really $20,000—there was a co-defendant, the owner of the car which had collided with Washington's—and that the offer was conditioned on receiving $10,000 from each. This was denied by counsel for the plaintiff who testified that he was willing to accept $10,000 but that the offer was never made. This was disputed by the insurer which claimed that $10,000 was offered before the trial ended. The jury returned an $80,000 verdict, the insurer paid $10,000 and did not appeal the verdict.

From a review of the record as a whole and viewing the proof in the light most favorable to the plaintiff, we are satisfied that the case was properly submitted to the jury under appropriate instructions[11] and that the jury was justified in finding that the insurer did not discharge its responsibility to consider the interests of Washington, the insured, at least equally with those of the company. In fact the conclusion is almost inescapable that the insurer was

10. In Detenber v. American Universal Ins. Co., 372 F.2d 50 (6th Cir.), cert. denied, 389 U.S. 987, 88 S.Ct. 413, 19 L.Ed.2d 479 (1967), applying Kentucky law, it was held that the insurer's defense of assumption of the risk in a drunken driving case did not constitute bad faith even though the insurer did not advise the insured or his counsel and even though the company did offer the full policy before the trial. Prof. Keeton terms the decision "questionable." R. Keeton, Insurance Law § 7.7(c), at 501 n. 3 (1971). It should be noted that in that case counsel stated that he had proof that the injured passengers knew that the driver had been drinking; that he had done so on other occasions; that a witness had seen the car being driven erratically and weaving at a rate of 50 miles an hour and that the passengers had physical possession of alcohol in the car. 372 F.2d at 52. No proof of this kind was proffered in this case.

11. Bad faith is generally proven by circumstantial evidence and " 'is most readily inferable when the severity of the plaintiff's injuries is such that any verdict against the insured is likely to be greatly in excess of the policy limits, and further when the facts in the case indicate that a defendant's verdict on the issue of liability is doubtful. * * * When these two factors coincide, and the company still refuses to settle, the inference of bad faith is strong.' " Brown v. United States Fidelity & Guar. Co., 314 F.2d 675, 679 (2d Cir. 1963).

We do not decide whether the state standard (Park v. Village of Waverly, 457 F.2d 1139, 1140 (2d Cir. 1972) ) or the federal standard Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir. 1970) ) was appropriate in determining whether to submit this case to the jury, since we find that the evidence was sufficient under either criterion.

essentially concerned with its own fortunes and not at all with the plight of the insured.

## V. DAMAGES

A reading of the record in this case indicates that the trial was conducted in a spirit of acrimony and bitterness with bickering between counsel and lawyer witnesses disrupting the orderly conduct of serious litigation. Judge Judd in his decision rendered shortly after trial denying the motions for a directed verdict and to set aside the verdict as being contrary to the evidence, stated that in forty years of trial experience, he did not recall another case that equalled the "unruly conduct and potential confusion in this case." He further characterized the verdict as a "miscarriage of justice." Despite his obvious distaste, particularly for the conduct of plaintiff's counsel, he upheld the verdict and characterized it as one which a jury might reach upon the applicable law. His adverse reaction to the verdict presumably was not that it had not been established that the defendant was guilty of "bad faith" but that the $70,000 verdict "is many times the most generous estimate of what could ever have been collected from Washington's own assets." He had charged the jury without objection, however, that if their verdict was for the plaintiff, it had to be for the full amount of the excess or $70,000. Appellant has raised no question about this on appeal. However, an exception was taken to the Judge's failure to charge that if they found Washington "judgment proof" they were to return a verdict for the defendant.

In our view the jury was properly charged according to the law of New York as it existed then and now. Interestingly this precise question has been raised in dicta in the most recent Court of Appeals opinions in Gordon v. Nationwide Mut. Ins. Co., 30 N.Y.2d 427, 334 N.Y.S.2d 601, 285 N.E.2d 849 (1972), which was decided after this case had been concluded.[12] Prior to *Gordon* there was ample authority that if a jury found that the insured was solvent and if they returned a verdict in his favor against the bad faith insurer, the measure of damages was the full amount of the excess judgment. (See cases cited in Judge Breitel's dissenting opinion in Gordon v. Nationwide Mut. Ins. Co., 30 N.Y.2d at 449, 334 N.Y.S.2d at 619, 285 N.E.2d 849). There is also authority that where the insured is actually insolvent at the time of entry of the excess judgment and it is discharged in bankruptcy, since the judgment is uncollectible, there is no monetary damage and judgment should be directed for the defendant. Harris v. Standard Acc. & Ins. Co., 297 F.2d 627 (2d Cir. 1961), cert. denied, 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed.2d 847 (1962); cf. Bourget v. Government Employees Ins. Co., 456 F. 2d 282 (2d Cir. 1972).

The dicta in the opinions in *Gordon* suggest that realistically there is a distinction between a thoroughly solvent insured and one who while not technically insolvent, is of such meager means that a judgment in a comparatively large amount is practically worth something less than the face amount of the excess verdict. Whether the theory of the plaintiff's action be in contract or in tort, the rule of actual or compensatory damages would appear to be the same —the plaintiff insured (or his representative or assignee) should only be entitled to recover to the extent that he has been or, in the reasonably foreseeable future, will be damaged by the outstanding judgment.[13] In short, how

---

12. We recognize that New York law as it presently exists is controlling for purposes of this appellate decision. Vandenbark v. Owens-Illinois Glass Co., 311 U.S. 538, 61 S.Ct. 347, 85 L.Ed. 327 (1941).

13. In Harris v. Standard Acc. & Ins. Co., 297 F.2d 627, 631–632 (2d Cir. 1961), cert. denied, 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed.2d 847 (1962), Judge Lumbard considered the action to be in tort. The suggestion that it might be in contract appears in Judge Friendly's opinion in Bourget v. Government Employees Ins. Co., 456 F.2d 282, 285 (2d Cir. 1972).

much is the verdict against him worth. This is clearly the view of Judge Breitel's dissenting opinion, joined in by Judges Burke and Gibson, and may well be the thrust of Chief Judge Fuld's concurring opinion, although we cannot be sure. But even though we would regard such a rule as sensible, as our dissenting brother does, and even assuming arguendo that this is the law in New York [14] we nevertheless do not consider it appropriate to remand the action for a determination of damages. As Judge Breitel pointed out, this realistic approach for the semi-solvent insured is limited to the extreme case where the magnitude of the excess judgment is so great as to make unjust, the imposition of liability to its full amount. 30 N.Y.2d at 450, 334 N.Y.S.2d at 620, 285 N.E.2d 849. In *Gordon,* the policy limit was $20,000 and the excess judgment was for $259,058.87. In the case before us, the policy limit was $10,000 and the excess judgment was $70,000. In *Gordon,* the insured had disappeared before the action and his whereabouts were unknown. He was a gas station employee whose only asset was an auto which was involved in the collision. In our case, at least at the time of the action below, Washington had married and was the owner of a cleaning and polishing business, he owned a truck and cleaning equipment, and had an interest in a house. While he was hardly a mogul, Washington was alive and in business and at least more solvent than the insured in *Gordon.* We cannot consider the verdict here extreme or punitive.

There is another reason why we believe New York law does not require a remand here. While the burden of proof is always on the plaintiff to establish actual damages, Judge Breitel indicates in *Gordon* that the burden is satisfied by proving the excess tort judgment. The insurer then may show that in fact the insured was invulnerable or immune to the judgment in whole or in part because of economic circumstances. Here, although defendant had requested a charge that a verdict for the defendant should be granted if the jury found him to be "judgment proof," as we have indicated, the charge was properly denied since the insurer offered no proof to counter Washington's testimony that he was in business, was a property owner and owned business paraphernalia. While there was evidence that Washington said that he had no assets at the time of the accident, there was nothing to counter his subsequent acquisition of

While the rule of compensatory damages might be the same (compare Restatement of Torts § 901, comment a at 537 (1939) with Restatement of Contracts § 329, comment a at 504 (1932)), the theory would create a question as to appropriate statute of limitations and possibly the question of an allowance of punitive damages. Judge Bergan's plurality opinion in *Gordon* seemingly is based on the theory that the action is for damages for breach of contract and he considered the verdict punitive (although it was measured by the excess verdict) and unsupportable in the absence of an extraordinary disingenuous or dishonest failure to carry out a contract. 30 N.Y.2d at 437, 334 N.Y.S.2d at 608–09.

14. In *Gordon,* the majority found no breach of good faith toward the insured since the company properly relied on the advice of counsel that the policy was cancelled prior to the tort because of a breach by the insured in his premium payment contract.

Hence finding no breach in bad faith discussion of damages is dicta. Chief Judge Fuld's concurring opinion was based on his agreement that the carrier did not exercise bad faith but he added that there was no proof of any actual damages. Judge Breitel's dissent apparently finding a breach, concurred in by two other Judges, discussed the elements of actual damages to be considered by a jury in determining the amount of recovery. This case illustrates the particular difficulty faced by a federal court in its attempt to determine New York law. Our principal guide is a recently decided, closely divided decision involving an emerging doctrine in the law of damages with dicta as the principal source for prognosis. A certification statute, similar to that now in effect in various other states, e. g., Florida, might help to ease the problem. See Clay v. Sun Ins. Office Ltd., 363 U.S. 207, 212, 80 S.Ct. 1222, 4 L.Ed.2d 1170 (1960) ; Cornellier v. American Cas. Co., 389 F.2d 641, 644 n. 3 (2d Cir. 1968).

modest means. Thus, this case is totally unlike the situation referred to by Chief Judge Fuld in Gordon, 30 N.Y.2d at 441, 334 N.Y.S.2d at 612, 285 N.E.2d at 856, where "there is not the slightest evidence, or even intimation, that the insured was harmed by the judgment . . . [or] that he had any assets which were imperiled. . . . " In short, we believe that the verdict in the full amount of $70,000 was therefore justified under New York law.

We have considered all of the appellant's other arguments and consider them to be without merit.

Judgment affirmed.

MOORE, Circuit Judge (dissenting):

In my opinion, there is every likelihood here that the insured (or his assignee) is being awarded a substantial windfall by the Court—a result cautioned against in this Court's past decisions (*see* Harris v. Standard Acc. & Ins. Co., 297 F.2d 627, 631–32 (2d Cir. 1961), cert. denied, 369 U.S. 843, 82 S. Ct. 875, 7 L.Ed.2d 847 (1962); Bourget v. Government Employees Ins. Co., 456 F.2d 282, 285 (2d Cir. 1972); *compare* Young v. American Cas. Co., 416 F.2d 906, 911 (2d Cir. 1969), cert. dismissed, 396 U.S. 997, 90 S.Ct. 580, 24 L.Ed.2d 490 (1970)) and in the recent decision of the New York Court of Appeals in Gordon v. Nationwide Life Ins. Co., 30 N.Y.2d 427, 334 N.Y.S.2d 601, 285 N.E. 2d 849 (1972) (concurring opinion of Chief Judge Fuld, and the opinion of Judge Breitel, joined by Burke and Gibson, JJ.).

Reversible error here stems from the trial court's error in his charge with relation to possible damages. This was error as a matter of law—New York law, concededly applicable. Nor is the problem of honoring *Erie* [1] without difficul-

ty, particularly since the law of the State as expounded by one group of judges (State) has to be interpreted by another group (Federal).

Search for New York law on the question of damages can largely be restricted to *Gordon, supra,* and the cases cited therein. The search should be thorough —especially so where, as here, the trial judge posted danger signals which have been clearly seen by the majority. Warnings that the verdict was "a miscarriage of justice",[2] and that "the $70,000 verdict [was] many times the most generous estimate of what could ever have been collected from [the insured's] own assets",[3] should upon review call for an attempted answer to the question: "Why this result, then?"

The result is achieved because the majority ignores a fundamental element in the insured's right to recover against his insurer: *viz.,* whether the insured was in fact exposed to pecuniary loss as a result of the insurer's refusal to settle the claim. Stated differently, and within the context of this appeal, the relevant inquiry should be: Is the award to the insured of the full amount of the excess judgment ($70,000) commensurate with the "damage" caused him by the insurer's failure to settle when his total assets may total considerably less than $70,000? Because the proof below regarding the insured's asset holdings (if any) was, at best, confused,[4] and because I think the trial court erred in his jury instructions regarding damages, I would reverse and remand the case for proper determination of the insured's economic status and the question of damages.

In light of the insubstantial evidence adduced below, despite the insured's self-serving testimony that he owned assets consisting of a cleaning business, a

---

1. Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

2. Opinion Accompanying Trial Court's Decision Denying Defendant's Motions, reprinted in Appendix, at 1559a.

3. *Id.* at 1561a.

4. There was testimony, including that of the insured himself, that he owned no assets and was "judgment proof" in the tort action brought against him by Miss Peterson. The insured later changed his story.

truck, and part interest in a house (highly dubious assets), I agree with the trial court that the $70,000 verdict in the insured's favor represents many times the most generous estimate of what could have been collected from his assets. In fact, the trial court virtually admitted error in stating that "My instructions to the jury permitted a verdict for the [insured] even if [he] was insolvent at the time of trial * * *." [5] The court's instructions were as follows:

> "If [the insured] had no property that he could lose as a result of the judgment, the insurance company still couldn't disregard his rights because an unsatisfied judgment against you stays for 20 years * * *." (Appendix, p. 1477a)

> * * * * * *

> "[I]f you find by a preponderance of the evidence that there was bad faith by the insurance company in the defense of this action * * * and you determine [its] liability—[in] a verdict for the plaintiff, you have to give a verdict for the full amount of the excess of $70,000 that is due on the judgment * * *." (*Id.* at p. 1487a)

It is clear beyond peradventure that the foregoing instructions are erroneous, when tested in light of the opinions accompanying the decision in *Gordon, supra,* the New York Court of Appeals' most recent pronouncement on the question of damages in insurer "bad faith" actions. It is not clear in *Gordon* whether the insured there was insolvent. In his concurring opinion Chief Judge Fuld appeared to assume that the insured was at best only barely solvent in concluding that the insured's economic condition was so poor that he had no assets to be imperiled and that, therefore, he had suffered no actual damage by the insurer's refusal to settle the claim against him. Chief Judge Fuld said:

> "There are * * * decisions in some jurisdictions which hold that an excess judgment entered against the insured measures the damages suffered by him even though he may be insolvent and the judgment uncollectible. I find such a rule both unreasonable and unfair. Recovery against an insurer should not be sanctioned or upheld as punishment or a punitive measure. In my view, an insured is not harmed and, by that token, suffers no damage when an uncollectible judgment is entered against him. (Cf., e. g., Bourget v. Government Employees Ins. Co., 456 F.2d 282; Harris v. Standard Acc. Ins. Co., 297 F.2d 627, 631–32, cert. den. 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed.2d 847." 30 N.Y.2d at 439–440, 334 N.Y.S.2d at 611, 285 N.E.2d at 856.

Judge Breitel, writing in *Gordon* for three judges, also argued that the trial court had erred in charging that, if the insurer's bad faith were found, the insured's damages should be measured by the full amount of the excess judgment. 30 N.Y.2d at 441, 334 N.Y.S.2d at 613, 285 N.E.2d at 857. Judge Breitel expressed his view of the measure of damages as follows:

> "[T]he better rule, in cases involving other than a solvent insured, would be for a trial court to instruct a jury with respect to the applicable factors, [e. g., the insured's economic status, age, economic prospects, skills, health, economic prospects of his estate,] bearing on the pecuniary and tangible harm done to the insured and assess that harm to include the economic harm to the insured now and in the reasonably anticipated future, of the overhanging excess judgment. Included, too, would be any other tangible harms, such as the loss of the right to operate motor vehicles or to obtain employment or insurance." 30 N.Y.2d at 451, 334 N.Y.S.2d at 621, 285 N.E.2d at 863.

Such an approach realistically protects both the insured and the insurer; the insured is protected against exposure to

---

**5.** Opinion, *supra* note 2, at 1560a.

*actual* loss suffered by him due to the insurer's bad faith refusal to settle a claim; and the insurer will not be compelled to provide his insured with unlimited coverage on a policy, as here, which the parties had agreed would carry a limit of $10,000.

In *Harris, supra,* (in language quoted with approval by Chief Judge Fuld in *Gordon, supra*) we said:

> "The law of New York requires proof of actual loss to support recovery for a tort of this type. The purpose of tort damages is to compensate an injured person for a loss suffered and only for that. The law attempts to put the plaintiff in a position as nearly possible equivalent to his position before the tort. Recovery is permitted not in order to penalize the tortfeasor, but only to give damages 'precisely commensurate with the injury'" (footnotes omitted) 297 F.2d at 631–632.[6]

The majority's opinion concedes that the " * * * insured (or his representative or assignee) should only be entitled to recover to the extent that he has been or, in the reasonably foreseeable future, will be damaged by the outstanding judgment [resulting from the insurer's bad faith refusal to settle]." But, having so stated, the majority proceeds to disregard this sound principle, on the questionable ground that "this realistic approach for the semi-solvent insured is limited to the extreme case where the magnitude of the excess judgment is so great as to make unjust [imposition upon the insurer of] liability to its full amount." The majority, in effect, is saying that its conscience is not offended by imposing on the insurer here a judgment of only $70,000 on a $10,000 policy, regardless whether the semi-solvent insured has in fact suffered damages in that full amount, because "the

verdict here [is not] extreme or punitive." The Court intimates that if the figures had been those involved in *Gordon, supra* (an excess judgment of $259,058.87 and a policy with a $20,000 limit), it would consider the magnitude of that judgment "so great as to make unjust" imposition of liability to the full amount of the excess judgment. Such an approach establishes a standard rife with arbitrary and inconsistent results, and one not susceptible of even-handed application. Thus, for example, if two insurers are found liable for bad faith in failing to settle, and each has a "semi-solvent" insured with a $10,000 policy limit, and the resulting excess judgment against insured *A* was only $70,000, while that against insured *B* was $170,000, under the majority's formulation the latter situation would presumably be deemed "extreme or punitive" and the insurer would not be forced to indemnify his insured to the full amount of the excess judgment; whereas the $70,000 judgment, as in our case, not being "extreme or punitive", would be imposed to the full amount on the insurer of insured *A*, without inquiry as to actual harm suffered by the insured. Would an excess judgment of $100,000 on a $10,000 policy be considered punitive? What of a $150,000 judgment on a $30,000 policy? What is to guide a court in resolving the issue? The problems inherent in the majority's approach are manifest. The better rule, clearly, is to focus not on the magnitude of the excess judgment in ratio to the policy of coverage, but rather, on the amount of actual harm occasioned on the semi-solvent insured—and then impose on the bad faith insurer the amount of damage suffered by the insured. This was not done in the instant case.

In view of the insured's questionable solvency at trial below, in my opinion, it

6. Cf. Bourget v. Government Employees Ins. Co., supra, where Judge Friendly, 456 F.2d at p. 285, stated:

"[W]hat gives rise to the [insurer's] duty and measures its extent is the conflict between the insurer's interest to pay less than the policy limits and the insured's interest not to suffer liability for any judgment exceeding them. *In the rare instance where the insured has no such interest, there can be no conflict and the duty does not arise*" (emphasis added).

was error to charge the jury to return a $70,000 verdict against the insurer or nothing at all, if bad faith were found. If the insured was in fact insolvent and had no prospects of future income, the excess judgment against him would be worth zero. If he were barely solvent, or even moderately so, the excess judgment against him might be worth *something* (which the bad faith insurer should be required to pay) but certainly not the full amount ($70,000). The only proper resolution of this issue is to submit the question of the insured's solvency to the jury, with proper instructions, and to require the jury to fix the amount of the insured's actual damage suffered as being somewhere between zero and the full amount of the excess judgment. Judge Breitel has clearly indicated the determinative factors to be presented to the jury for a proper assessment of damages under New York law. The trial court erred in not so charging the jury, and in not establishing conclusively the insured's economic status. I would therefore reverse and remand the cause for a proper determination on the question of damages.