**Harold YOUNG, as Trustee in Bankruptcy of Robert S. Quigley, Bankrupt, and William S. Brown, as Trustee in Bankruptcy of Billy B. Walker, Bankrupt, and Robert S. Quigley and Billy B. Walker, Co-Partners, formerly doing business under the firm name and trade style of York Laundromat, Plaintiffs-Appellees,**

v.

**AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, Defendant-Appellant.**

No. 540, Docket 33197.

United States Court of Appeals Second Circuit.

Argued April 22, 1969.

Decided Sept. 15, 1969.

Certiorari Dismissed Jan. 12, 1970. See 90 S.Ct. 580.

**908**

Herman Cahn, New York City (Cahn & Ryp, New York City, on the brief), for plaintiffs-appellees.

Robert E. Curran, New York City (Kevin D. Moloney, New York City, on the brief), for defendant-appellant.

Before LUMBARD, Chief Judge and ANDERSON, Circuit Judge and WYATT, District Judge.*

LUMBARD, Chief Judge:

Plaintiffs, Trustees in Bankruptcy of Robert S. Quigley and Billy B. Walker, brought this diversity action to recover damages for defendant's refusal, allegedly in bad faith, to settle within the limits of a $20,000 liability insurance policy issued by defendant, American Casualty Company, a personal injury action brought against Quigley and Walker in their capacity as owners of the York Laundromat. After trial before a jury American was found liable and damages of $70,330.25 were awarded.[1] American appeals on the grounds that it could not be found to have refused in bad faith to settle within the limits of the policy and that, assuming liability, plaintiffs' damages could not have exceeded $7,278.61, the total amount which was paid by the plaintiffs to the personal injury claimant prior to their discharge in bankruptcy.

There was substantial evidence from which the jury could have concluded that American acted in bad faith in failing to settle within the policy limits by not entering into settlement negotiations, and by not informing the insureds of the possibility of settlement. Since the insureds were not insolvent before the excess judgment was rendered and since they paid a part thereof from the proceeds of the sale of their laundromat prior to their filing voluntary bankruptcy petitions, the fact that they have been personally discharged from future liability on this judgment does not inure to the benefit of American.

In 1960 American issued a liability insurance policy to the York Laundromat providing coverage of $20,000 for each person injured, and a maximum of $40,000 for each accident. The policy contained the standard provision that American would defend any suit against the insured seeking damages for bodily injury. On September 30, 1960, Margaret Flynn, while a customer in the laundromat, located at 1505 York Avenue in Manhattan, slipped and fell on a wet floor, sustaining severe injuries. Miss Flynn commenced an action against the laundromat and its owners in the New York Supreme Court, alleging negligence arising out of the slippery condition of the laundromat floor. On September 24, 1962, a judgment of $90,330.25 was entered in favor of Miss Flynn. American paid $20,000, the amount of the coverage and an excess judgment of $70,330.25 was entered against Quigley and Walker.[2]

Prior to the entry of the Flynn judgment both Quigley and Walker were solvent. In addition to income from their absentee ownership of the York Laundromat each engaged in full time outside employment. Subsequent to entry of judgment against them Quigley and Walker liquidated their holdings in the York Laundromat and applied the proceeds, approximately $7,200, to the Flynn judgment. Since a combined indebtedness of over $63,000 remained, and their assets were substantially less than

---

* Sitting by designation.

1. A second cause of action, brought by Quigley and Walker individually, was dismissed by Judge MacMahon at the close of plaintiffs' case.

2. This judgment was affirmed by the Appellate Division, First Department, and leave to appeal was denied by the Court of Appeals.

that amount, Quigley and Walker, on May 12, 1967, filed voluntary petitions in bankruptcy in the Southern and Eastern Districts of New York, respectively. Only one debt was scheduled in each of the petitions, and that was the amount owed to Miss Flynn on account of the excess judgment. Although both were discharged the bankruptcy proceedings apparently remain open pending the outcome of this damage action against American.

In October, 1968, the instant action was tried before Judge MacMahon and a jury. Plaintiffs' proof was that after notifying American of the Flynn accident Quigley and Walker received a notice from American advising them that they had the right to have their own attorney sit in on the case with Mr. Ahmuty, American's attorney, since the amount claimed exceeded the policy coverage. Walker testified that he spoke to Ahmuty about this letter and that Ahmuty referred to it as a form letter. Walker allegedly was told that it was not absolutely necessary for him and Quigley to retain independent counsel and that, if they did, counsel's role would be that of an observer. Both Quigley and Walker testified that they were never interviewed by anyone on behalf of American prior to the Flynn trial, that employees of the laundromat who might have been witnesses to the accident were not sought out by American, and that the laundromat's business and repair records were not reviewed. The subject of settlement was never mentioned by American to Quigley and Walker, nor were they asked if they would be willing to contribute to a possible settlement.[3] A memorandum written by Mr. Ahmuty to an individual in American's claims department stated that Miss Flynn's counsel had made a demand of $40,000 but that Ahmuty had made no offer in response thereto. Through the expert testimony of an attorney plaintiffs sought to establish that, in the factual context presented by the Flynn action, an insurance company would make a serious effort to settle this case by responding to a demand of $40,000 through disclosure of the lesser amount of coverage and the substantial questions surrounding their alleged liability.

Mr. Ahmuty testified for American concerning the serious doubts he entertained prior to trial on the potential liability to Miss Flynn.[4] Ahmuty denied Walker's contention that he had represented to Walker that it was not necessary to get independent counsel. In answer to questions by the court, Ahmuty testified that in response to the $40,000 demand of Flynn's counsel he made no counter offer.[5]

---

3. Quigley testified he was not told the date of the Flynn trial and that he was never consulted nor advised about any offer of settlement.

4. Miss Flynn claimed that the wet condition of the floor was caused by an overflow from an adjacent washing machine. Ahmuty relied upon her earlier statements that she did not know what caused her fall.

5. "By the Court:
 Q. Do you recall there being an offer to you to settle this case? A. There was a statement, if your Honor please, outside the courtroom at the door of the courtroom. Julian came out, I remember this very vividly, out of actual knowledge, and that was—it wasn't an offer. He said, 'I want $40,000 for the case.'
 Q. Did you make a counteroffer? A. I said to him as (sic) purely academic,

'We don't have that kind of money. We don't have that kind of coverage.'
 I told him that right then and there.
 Q. Did you disclose the coverage? A. No, sir, he didn't ask me.
 Q. You didn't disclose it? A. He walked away from me when I answered it.
 Q. Did you advise the insured here that there had been an offer for $40,000? A. I would say we discussed it at lunch, sir, discussed everything.
 Q. What did you say to him—to whom? A. I couldn't—I had lunch with Mr. Walker. I couldn't tell you.
 Q. Did you tell him that there was a chance to settle for $40,000? Did you tell him how much the suit was for? How much was the suit for? A. $100,-000, sir.
 Q. Did you ask him if he was interested in settling for forty, coming up

Judge MacMahon charged the jury that in determining whether American had acted in bad faith in failing to settle the case it should consider:

"Did they try to settle within the policy limits? Did they make any effort at all to do so? If they did not, why didn't they? They are under an obligation to act here as though they were fully liable for whatever judgment might be rendered against the plaintiff or against Quigley and Walker. In other words, they have to act as though only their own money was on the line here, that they were the only ones at risk of financial loss. It is that kind of a judgment that they must make, an honest judgment as though all the loss were going to come out of their own pocket."

## I. Liability

 Under New York law, which concededly governs here in this diversity action, it is well settled that the insurance company is under a duty to negotiate a settlement in good faith and that the interests of the insured must be given "at least equal consideration in evaluating the propriety of a settlement." Brown v. United States Fidelity & Guaranty Co., 314 F.2d 675, at 678 (2 Cir. 1963). Where, because of the likelihood that an excess verdict will be returned, the greater financial risk of the litigation rests on the insured, a finding of bad faith on the part of the insurer may be based on such factors as these:

(1) The failure of the insurer to investigate properly the circumstances of the accident.

(2) The refusal of the insurer to accept a settlement within the limits of the policy.

(3) The failure of the insurer to inform the insured of a compromise offer.

(4) The failure of the insurer to attempt to induce contribution by the insured.[6]

In this instance there existed a likelihood that an excess verdict would be returned, and thus insureds were subjected to the greater financial risk of litigation. The jury could have concluded that American failed to investigate the accident properly, failed to inform the insureds of Flynn's demand, and failed to attempt to induce the insureds to contribute to any proposed settlement. The evidence also supported the view that had American responded to Flynn's demand for $40,000 a settlement within the $20,000 limit of the policy might have been reached, or, that had the insureds been fully advised a settlement could have been made with some small contribution from them.

 We recognize that, in the usual case, to establish bad faith by the insurer an insured should demonstrate that the claim could have been settled within the policy limits, or, if only a settlement in excess of the coverage could have been achieved, that the insured was willing and able to provide the excess amount. But we believe that under New York law, where an insured reasonably relies upon its insurer to conduct settlement negotiations, and such insurer neither attempts to secure a modification of the initial settlement demand nor communicates that demand to its insured, the jury may find that the insurer did not act in good faith.

 Where an insurer receives an offer of settlement in excess of the coverage of its policy it acts in bad faith if it fails to make any attempt to engage the injured plaintiff's counsel in discussions seeking a reduction in the initial settlement demand and if it fails to inform its insured of the opportunity to settle. The initial demand of plaintiff's

with the other twenty? A. I have no recollection of saying that to him.

Q. Would you say that you did or you didn't? A. I couldn't honestly answer that question, sir."

6. Brown v. United States Fidelity & Guaranty Company, *supra*, at 678–679. See also Bates v. Merchants Mutual Ins. Co., 277 F.Supp. 308, 312 (N.D.N.Y.1967), aff'd, 392 F.2d 591 (2 Cir. 1968) (per curiam).

counsel often will be as far removed from the actual figure acceptable in settlement as the *ad damnum* in the complaint is removed from the initial settlement demand, especially in a personal injury action. It is a matter of common knowledge that it is a rare case where exploration of the possibilities of settlement, beyond the mere receipt of the plaintiff's demand, will not result in some substantial reduction of the amount.

■ American, through Ahmuty, having failed to make any response to Flynn's demand, and having failed to inform the insured of the possibility of settlement, should not now be heard to claim that bad faith cannot be found absent proof by the insured that a settlement within the policy limits was possible, or, in the alternative, that the insureds were willing and able to contribute any excess required to effect a settlement beyond the policy limits. Plaintiffs herein did not offer proof that either alternative could have been attained.

To require the insured to establish his willingness to contribute toward a settlement presupposes a settlement figure toward which contribution may be made. The personal injury plaintiff's initial demand is not the settlement figure against which proof of an insured's willingness to contribute should be measured. Had the insurer attempted to fulfill its responsibility by preliminary negotiations of the initial demand figure, the resultant settlement might well have been within the policy limits or, at worst, within the ability of the insured to make sufficient contribution to effect a settlement. Any doubt which admittedly exists in speculating on these possibilities should be resolved in favor of the insured unless the insurer, by some affirmative evidence, demonstrates that not only was there no realistic possibility of settlement within the policy limits, but also that the insured would not have contributed to whatever settlement figure could have been obtained. There was no basis for American to act as if the pos-sibility of settlement was foreclosed by the initial demand of Margaret Flynn's counsel for $40,000.

## II. Damages

■ Since the insureds have been discharged in bankruptcy and the Flynn judgment has been cancelled of record (pursuant to N.Y. Debtor and Creditor Law § 150 (McKinney's Consol.Laws ed. Supp.1968)), American contends that the limit of its liability to the trustees should not exceed $7,278.61, the amount actually paid by the insureds to Miss Flynn. American misconstrues our opinion in Harris v. Standard Accident & Ins. Co., 297 F.2d 627 (2 Cir. 1961), cert. denied, 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed.2d 847 (1962). *Harris* recognized that New York law requires proof of actual loss to support recovery by the insured or his estate for the insurer's bad faith in failure to settle. We there held that, where the insured was insolvent before the rendition of the excess judgment, had not paid any part of it, and subsequently had been discharged from any future obligation to pay it, he was not actually harmed by the bad faith refusal of his insurer to settle. We noted that in only a very small percentage of such bad faith cases would the insured be insolvent at the time of settlement negotiations. In considering the question of damages to a solvent insured, such as Quigley and Walker at the time of the excess judgment, we stated:

"For if the insured's assets exceeded his liabilities exclusive of the excess judgment, then the insured, although discharged in bankruptcy, would actually be damaged by the value of his net estate before rendition of the excess judgment. However, the recovery of that amount by his trustee in bankruptcy would be applied to the payment of his debts. The only way to make the insured whole, i. e., to place him in a position where his net assets are as great after as before payment of the excess judgment, would be to allow him to recover the entire amount of that judgment." 297 F.2d at 632.

Our statement in *Harris* of what we believe the New York law to be regarding recovery by a formerly solvent insured who has not paid the excess judgment has recently been approved by a New York court.[7]

The recovery of $70,330.25 by the trustees in this action will become an asset of the respective bankrupt estates. Since the only debt scheduled against each estate is the remainder of the excess judgment still owing Miss Flynn, approximately $63,000 will pass through the estates to her. The fact that Quigley and Walker have received a discharge in bankruptcy does not affect this result. Their discharges are personal to them, affording a defense to subsequent prosecution against them as individuals of this claim. The estates in bankruptcy are not affected by the discharge.[8] Only to the extent that anything remains in the estates subsequent to payment of administrative expenses and the Flynn claim will any money be available for the discharged bankrupts.

Judgment affirmed.

WYATT, District Judge (dissenting):

Because I agree with so much in the careful opinion of Chief Judge Lumbard, it is with reluctance that my dissent from the decision is noted.

In this type of situation, however, it seems to me that the core of the actionable wrong is the failure or refusal of the insurance carrier to settle when settlement within the policy limit *could have been,* and should have been, effected. Thus, it is an essential element of the case for the insured that the claim could have been settled within the policy limit. There was a complete failure of proof of this essential element.

For present purposes it is not necessary to consider whether a carrier may be liable for refusal to settle for an amount in excess of the policy if the insured proves that he could have, and

would have, paid the excess. It has been suggested that there may be such liability, the only precedent cited having been decided on a pleading point. Keeton, Liability Insurance and Responsibility for Settlement, 67 Harv.L.Rev. 1136, 1148–50 (1954).

The judgment here on appeal was entered after submission to the jury of a single issue, "bad faith," and an instruction by the Court that if there was bad faith, then there should be a verdict for plaintiffs for the excess above the policy limit ($20,000) of the judgment on the Flynn claim against the insureds. This represents in substance a finding of fact by the trial court that the Flynn claim could have been settled for not more than $20,000. There is no evidence to support the finding and in any event it was an invasion of the jury's province.

It seems generally to have been assumed that plaintiffs in this type of case must establish that the claim could have been settled within the policy limit; usually the proof is that an offer of settlement within the policy limit had in fact been made and been rejected by the carrier.

In his discussion of the matter in Brown v. United States Fidelity and Guaranty Co., 314 F.2d 675 (2d Cir. 1963), Judge Irving R. Kaufman assumes that a prerequisite to liability is an offer of settlement within the policy limit and rejection by the carrier. He puts an example "for purposes of illustration" in which

> "an insurance company issues a liability policy with a limit of $20,000, that an action is brought against the assured for $45,000, and that *the claimant has offered to compromise its claim for $15,000.*" (314 F.2d at 678; emphasis supplied)

Judge Kaufman then concludes that the carrier under some circumstances

---

7. Henegan v. Merchants Mutual Ins. Co., 31 A.D.2d 12, 294 N.Y.S.2d 547 (1st Dept. 1968).

8. See generally 1 J. Moore, Collier on Bankruptcy ¶¶ 17.27–17.30 (14th ed. 1961).

would be reckless "if it failed to accept the compromise offer" and he continues (314 F.2d at 679):

> "Recklessness in such circumstances is tantamount to bad faith when we assume that the policy limit is only $20,000 and that the assured is personally responsible for any excess liability. In such a case, the risk to the company in going to trial is $5,000; the risk to the assured is $25,000."

The necessity for a showing that the claim could have been settled within policy limits is demonstrated in General Casualty Co. v. Whipple, 328 F.2d 353 (7th Cir. 1964). A jury verdict against the carrier had been set aside by the District Court and judgment entered for the carrier. The Court of Appeals affirmed. The policy limit was $50,000. The recovery sought on the insured claims was "far in excess of * * * policy limits" (328 F.2d at 354). The carrier defended and judgment resulted against the insured for $76,500. The insured asserted a claim against the carrier for the excess above the policy limit (which had been paid). It appeared that claimants had offered to settle for about $190,000, that they had "never offered to settle for the maximum limits of the policy" (328 F.2d at 356), and that the carrier "never received or made an offer to settle within the policy limits" (328 F.2d at 356). In finding for the carrier, the Court of Appeals stated (328 F.2d at 357):

> "The determination in this class of cases is one of fact and the result in each case depends upon its own peculiar facts. Unlike the above cases, in the instant case the occupants' attorneys made no offer to settle within the policy limits or for any amount reasonably close thereto. Plaintiff's attorneys reasonably believed there was no probability of affecting such a settlement and that they had a strong defense. The matter was further influenced by other pending suits arising out of the same collision.

> "We hold that under the facts of this case, no reasonable person, after equal consideration of the interests of the insurer and the insured, would decide that the insurer had an affirmative duty to attempt to settle the case within the policy limits."

The Ninth Circuit has stated the principle in National Farmers, etc. Casualty Co. v. O'Daniel, 329 F.2d 60 at 64–65 (9th Cir. 1964; emphasis supplied):

> "It has been held that a policy of this type places a fiduciary duty on the insurance company to look after the interests of the insured as well as its own, thus requiring it to consider fairly the insured's liability for the excess when evaluating an offer of settlement *within the policy limits*. Failure to do so is bad faith and renders the company liable for its breach of fiduciary duty in the amount of any judgment over the policy limits."

One of the leading cases is Comunale v. Traders & General Ins. Co., 50 Cal.2d 654, 328 P.2d 198, 68 A.L.R.2d 883 (1958). The Court there stated (at 201; emphasis supplied):

> "When there is great risk of a recovery beyond the policy limits so that the most reasonable manner of disposing of the claim is a settlement *which can be made within those limits*, a consideration in good faith of the insured's interest requires the insurer to settle the claim. Its unwarranted refusal to do so constitutes a breach of the implied covenant of good faith and fair dealing."

Where the carrier wrongfully refuses to defend against the claim and a judgment is taken against the insured for an amount in excess of the policy limit, the carrier is liable if, but only if, there had been an offer of settlement within the policy limit and refusal by the carrier. Seward v. State Farm etc. Insurance Co., 392 F.2d 723 (5th Cir. 1968).

In the case at bar plaintiffs appear to have accepted this principle. Their complaint averred that "defendant could have effected a reasonable settlement within the limits of the Liability Policy." This was denied in the answer and so the issue stood when the case was submitted to the jury.

There was no evidence that the Flynn claim could have been settled for any amount except (possibly) $40,000 (as against a policy limit of $20,000). The only evidence submitted for plaintiffs were writings of the carrier showing that at or just before the commencement of trial of the Flynn claim, her lawyer made a "demand" for $40,000 and the carrier made no counter offer.

In my view, therefore, the plaintiffs failed to prove a case and a verdict for defendant should have been directed.

The charge of the trial court submitted only one issue to the jury—whether the carrier acted in bad faith or not. The jury was told that if there was bad faith, then the "measure of damage is precisely fixed. It is the difference between $20,000 and $90,000, $70,000." This is in substance a finding of fact by the Court that the Flynn claim could have been settled for $20,000 or less.

The jury had some difficulty about the amount of damages and while deliberating sent a note to the Court, asking "what the monetary damages are here." The trial judge gave the jury —apparently by writing on the jury's note—"the correct figure" of $70,330.25, which amount was later returned as the jury's verdict.

Whether my view that there was a failure of proof by plaintiffs be correct or not, it was plainly for the jury to decide, under proper instructions, whether or not the Flynn claim could have been settled for $20,000. The issue was not submitted to the jury, however, but was decided by the trial court. This to me seems error.

I would reverse the judgment and remand with a direction to dismiss the action on the merits.