YONKERS CONTRACTING COMPANY,
INC., Plaintiff,

v.

GENERAL STAR NATIONAL INSUR-
ANCE COMPANY and Admiral In-
surance Company, Defendants.

GENERAL STAR NATIONAL
INSURANCE COMPANY,
Third–Party Plaintiff,

v.

ST. PAUL FIRE AND MARINE INSUR-
ANCE COMPANY and Landmark Insur-
ance Company, Third–Party Defendants.

No. 97 Civ. 4767 (SAS).

United States District Court,
S.D. New York.

July 15, 1998.

Daniel O. Dietchweiler, John V. Fabiani, Jr., Brody, Fabiani & Cohen, New York, NY, for Plaintiff.

Gary Petropoulos, Monte E. Sokol, L'Abbate, Balkan, Colavita & Contini, L.L.P., Garden City, NY, for defendant Admiral Ins. Co.

Christopher T. Bradley, Paul B. Hyman, Marshall, Conway & Wright, P.C., New York, NY, for defendant General Star Nat. Ins. Co.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Plaintiff Yonkers Construction Company ("Yonkers") brings this action to recover under liability insurance policies issued separately by defendants Admiral Insurance Company ("Admiral") and General Star National Insurance Company ("Gen Star"). The Complaint makes claims for breach of defendants' contractual obligation to defend and indemnify plaintiff in a lawsuit between Yonkers and an employee of one of its subcontractors. Plaintiff seeks declaratory relief and indemnification for damages caused by defendants' breach. Admiral now moves, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss the Complaint for failure to state a legally cognizable claim. Defendant Gen Star also moves to dismiss, pursuant to Fed.R.Civ.P. 12(b)(1), based on mootness. For the following reasons, Admiral's motion to dismiss is granted and Gen Star's motion to dismiss is denied.

## I. Background

### A. The Insurance Contracts

For the purposes of this motion, the following facts as stated in the Complaint are assumed to be true. On November 22, 1989, Yonkers entered into a contract with the City of New York to rehabilitate a viaduct on Interstate 495. First Amended Complaint for Declaratory Relief ("Amen. Cpt.") at ¶ 6. Pursuant to the agreement, Yonkers was obligated to obtain insurance coverage with respect to the rehabilitation project. *Id.* at ¶ 7. To fulfill this requirement, Yonkers employed St. Paul Fire and Marine Insurance Company ("St.Paul") as its primary insurer and Landmark Insurance Company ("Landmark") as an excess insurer.

On or about April 6, 1990, Yonkers entered into a subcontract with Rice Mohawk U.S. Construction Company, Ltd. ("Rice Mohawk") for the replacement of steel structures in connection with the rehabilitation project. *Id.* at ¶ 8. The Yonkers–Rice Mohawk contract contained two provisions particularly relevant to the present dispute. First, the contract required Rice Mohawk to hold harmless and indemnify Yonkers for all claims of injury arising out of Rice Mohawk's work. *Id.* at ¶ 9. Second, the contract obligated Rice Mohawk to obtain insurance affording coverage to Yonkers for any claims of injury arising out of Rice Mohawk's work. *Id.* at ¶ 9. Accordingly, Rice Mohawk secured insurance from Admiral that provided general primary liability protection, limited to $1,000,000 of coverage for each occurrence.[1] *Id.* at ¶ 10. Under the terms of the contract between Rice Mohawk and Admiral, Yonkers qualified as an additional insured. *Id.* at ¶ 13. In addition, Rice Mohawk obtained an excess liability insurance policy from Gen Star which issued a limit of liability in excess of the primary insurer up to $5,000,000.[2] *Id.* at ¶¶ 14, 17. Yonkers was insured under this policy as well.

### B. The Pierce Accident

On or about July 15, 1992, Robert Pierce, an employee of Rice Mohawk, was injured when he fell to the ground from the boom of a crane located on Yonkers' construction site. *Id.* at ¶ 19. In November of the same year, Pierce commenced a lawsuit against Yonkers alleging that its negligence had caused Pierce's injury. *Id.* at ¶ 20. Yonkers tendered its defense to this action to Admiral, as an additional insured under Rice Mohawk's

---

1. The Admiral policy states, in pertinent part:

 Regardless of the number of (1) Insureds under the policy, (2) persons or organizations who sustain personal injury, or (3) claims made or suits brought on account of personal injury, the total liability of the Company under this coverage for all damages shall not exceed the limit of personal injury stated in the declarations as "aggregate".

 *See* Amen. Cpt. at ¶ 11.

2. The Gen Star policy follows the same form as the Admiral policy. It provides, in pertinent part:

 Except for the limits of liability and any provisions in the underlying insurance policy, including any endorsements attached hereto, the terms, conditions, agreements, definition, exclusions and limitations of the controlling underlying insurance policy are incorporated by reference as a part of this Policy.

 *See* Amen. Cpt. at ¶ 14.

policy, by letter dated January 20, 1993. *Id.* at ¶ 21, Exhibit E. On January 28, 1993, Admiral assumed Yonkers' defense, subject to the policy limit of $1,000,000.[3] *Id.* at ¶¶ 22, 23, Exhibit F. Admiral also agreed to control Yonkers' defense during the dispute.[4] *See id.*

### C. The Insurance Disputes and Settlement

Having failed to reach a settlement within policy limits, Admiral tendered its policy to Gen Star by letter dated November 30, 1995. *Id.* at ¶ 25, Exhibit H. In its letter, Admiral informed Gen Star that Pierce's settlement demand far exceeded Admiral's policy limit. *Id.* Accordingly, Admiral made its $1,000,000 limit available to Gen Star for the purpose of negotiating a settlement. *Id.* By letter dated December 12, 1995, Admiral reiterated its tender to Gen Star and expressed its concern that Gen Star had done nothing in furtherance of the matter.[5] *See id.*, Exhibit I. On December 14, 1995, Yonkers joined Admiral in its demand that Gen Star immediately make a good faith effort to resolve the Pierce dispute. *Id.* at ¶ 30, Exhibit J. Specifically, Yonkers told Gen Star,

> ... you have been on notice of Admiral's representation of Yonkers Contracting for

more than two years and ... you have received all substantive reports advising of the progress of the case ... Notwithstanding in excess of two years notice of Admiral's representation of Yonkers Contracting under the additional insured endorsement, General Star has never taken a position adverse to full and unconditional coverage and has never reserved any right under the excess policy.... On behalf of Yonkers Contracting, demand is hereby made that good faith efforts be made to settle this matter within the primary and excess policy limits. Apparently, plaintiff's counsel is willing to settle for less than $2,000,000.

*Id.*

Following the letter, Yonkers and Gen Star held a telephone conversation on December 15, 1995. *See id.*, Exhibit K. During this conversation, Yonkers claims that Gen Star articulated, for the first time, that its excess policy would only be available to Yonkers after all other insurance had been exhausted. *Id.* Yonkers followed this conversation with a letter to Gen Star dated December 19, 1995 in which Yonkers expressed its outrage over Gen Star's position.[6] *Id.*, Exhibit K.

---

**3.** In its letter dated January 28, 1993, Admiral also indicated to Yonkers that the Pierce complaint did not specify a specific amount of damages. Therefore, Admiral acknowledged that a possible award could be entered against Yonkers in excess of the amount of available coverage provided under Admiral's policy. Accordingly, Admiral suggested that Yonkers monitor the development of the Pierce dispute should this become an issue. *See id.*, Exhibit F.

**4.** It appears that Admiral represented Yonkers throughout the trial as well as during post-trial proceedings and on appeal. *See generally* Admiral's Memorandum in Support of its Motion to Dismiss ("Adm., Mem.") at 5. In doing so, Admiral retained counsel to represent Yonkers. *See* Amen. Cpt., Exhibit F.

**5.** The December 12, 1995 letter, from Admiral to Gen Star states, in pertinent part:

> I was somewhat perturbed to learn from Trial Counsel that none of the $1,000,000.000 Admiral policy limit which was tendered to Gen Star on 11/29/95 has been offered to the Plaintiff in this matter which is almost certain to exceed $1,000,000.00.
> When I discussed the tender of the Admiral policy with you, I indicated that I could either tender to the Plaintiff or to General Star.

**6.** The following is an excerpt from Yonkers' December 19, 1995 letter to Gen Star:

> It was agreed that we would tender to General Star, it being understood that good faith efforts would be made to utilize said funds to settle this claim.
> Our trial counsel indicates to us that this matter could be settled for less than $2,000,-000.000 but without any offer on the table, it will be difficult to see how this matter can be settled.
> Accordingly, we anticipate a good faith effort will be made to resolve this claim and that the $1,000,000.00 tendered by Admiral will be offered well before a verdict is reached as the actual trial of this matter did begin on Monday, December 11, 1995 in Supreme Court, Queens County.
> Since you are in control of the funds relative to the Admiral policy limit, we expect such good faith efforts be made and will look to you in the event of an excess verdict should our $1,000,000.00 not be tendered forthwith.
> *See id.*, Exhibit I (emphasis added).

> On November 30, 1995, before the commencement of jury selection and certainly before the commencement of the liability trial, Admiral

On December 31, 1995, the jury returned a verdict in the suit against Yonkers in excess of $3,900,000. In a decision by the Appellate Division, Second Department, dated October 27, 1997, the damages were reduced to $2,660,000. *Id.* at 36. On December 27, 1997, the $2,660,000 judgment was finally satisfied by Yonkers with funding provided by various insurers.[7] According to Yonkers, these payments were made, "on a without prejudice basis with Yonkers, St. Paul, Landmark, and Gen Star, reserving their rights to obtain a declaration from this court as to which parties had the obligation to indemnify Yonkers and in what amounts said indemnification was to be made." *Id.* at ¶ 38. Yonkers now seeks such a declaration regarding the amounts Admiral and Gen Star are required to contribute to the settlement, as well as damages arising from both defendants' handling of the claim during the settlement negotiations.

### D. The Specific Claims by Yonkers

Yonkers asserts three claims against Admiral. The first claim alleges a breach of contract on the part of Admiral and seeks a declaration that Admiral is obligated to indemnify Yonkers in the amount of its policy limit plus interest. *Id.* at ¶ 44. The second claim seeks a declaration that Admiral has waived any potential policy defenses and is obligated to pay its full policy limit towards settlement of the Pierce dispute. *Id.* at ¶ 49. The final claim against Admiral alleges damages based on the fact that Yonkers was prejudiced by Admiral's assertion that the entire limit of liability under its policy would

not be available for indemnification in the Pierce dispute. *Id.* at ¶ 55.

Yonkers also asserts three claims against Gen Star. The first claim alleges a breach of contract on the part of Gen Star and seeks a declaration that Gen Star is obligated to indemnify Yonkers in the amount that the Pierce settlement exceeds Admiral's policy limit. *Id.* at ¶ 61. The second claim seeks a declaration that Gen Star has waived any policy defenses to coverage and that it is obligated to pay the settlement amount not covered by Admiral. *Id.* at ¶ 66. Finally, Yonkers claims that in accepting Admiral's policy limits, Gen Star represented that it would make efforts to negotiate the settlement of the underlying action and that it would indemnify Yonkers in any amount paid to Pierce in excess of Admiral's policy. *Id.* at ¶ 68. Accordingly, Yonkers claims that it has been prejudiced by Gen Star's failure to act in its best interest to pursue the lowest possible settlement in the Pierce dispute, and that such inaction prevented Yonkers itself from settling the matter within Admiral's policy limits or an amount lower than the ultimate judgment. *Id.* at ¶ 71.

### II. Standards of Review

 Defendant Admiral moves to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). In considering a 12(b)(6) motion to dismiss, a district court must limit itself to the "facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 661 (2d Cir.1996)

Insurance Company tendered its full $1 million limit to General Star.... Notwithstanding that General Star purportedly believed there to be another $1 million policy between the Admiral policy and the attachment point of its excess policy, General Star accepted the tender and therefore withheld the Admiral policy limits from defense counsel for settlement purposes. As a consequence, there were no settlement negotiations and the case was permitted to go forward.... It was not until December 15,

1995 that your counsel first contacted this office to advise Yonkers of General Star's position.... Under these circumstances, we find that General Star has severely prejudiced the rights of Yonkers Contracting. Had General Star seriously believed there to be a $1 million policy between the Admiral limits and the excess policy, it should never have accepted Admiral's tender.

*See id.,* Exhibit K.

7. Payment of the settlement has been provided by Yonkers' insurers as follows:

| | | | |
|---|---|---|---|
| St. Paul | (Yonkers' primary insurer) | : | $1,180,000 |
| Landmark | (Yonkers' excess insurer) | : | $133,500 |
| Gen Star | (Rice Mohawk's excess insurer) | : | $166,500 |
| Admiral | (Rice Mohawk's primary insurer) | : | $1,180,000 |

(internal quotations omitted). A court deciding a 12(b)(6) motion must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the non-movant's favor. *See Kaluczky v. City of White Plains,* 57 F.3d 202, 206 (2d Cir.1995). Furthermore, a 12(b)(6) motion cannot be granted simply because recovery appears remote or unlikely on the face of a complaint, because "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). Rather, dismissal can only be granted if "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Bernheim,* 79 F.3d at 321 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). However, "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *De Jesus v. Sears, Roebuck & Co.,* 87 F.3d 65, 70 (2d Cir.1996) (internal quotations omitted).

■■■■ Defendant Gen Star moves to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) based on mootness. Under the United States Constitution, the federal judicial power extends only to "cases" and "controversies." U.S. Const. art. III, § 2, cl. 1. For this reason, a threshold question in an action for declaratory relief must be whether a justiciable controversy exists. *United States Fire Ins. v. Caulkins Indiantown Citrus Co.,* 931 F.2d 744, 747 (11th Cir.1991). The controversy must be "definite and concrete, touching the legal relations of parties having adverse legal interests." *Brown and Root, Inc. v. Big Rock Corp.,* 383 F.2d 662, 665 (5th Cir.1967) (citing *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 81 L.Ed. 617 (1937)). Once a controversy ceases to exist, a federal district court has no jurisdiction to render a declaratory judgment. *See Pancake v. McCarthy,* 806 F.Supp. 378 (E.D.N.Y.

1992) (citing *Golden v. Zwickler,* 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969)).

■■■■ In determining whether a controversy exists, the court must examine whether "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Zwickler,* 394 U.S. at 106–08, 89 S.Ct. 956. At a minimum, a plaintiff must show: (1) that it personally suffered some actual or threatened injury as a result of the alleged conduct of the defendant; (2) that the injury fairly can be traced to the challenged action; and (3) that it is likely to be redressed by a favorable decision. *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). A determination of mootness can only be made after a close analysis of the relevant facts. *Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974).

## III. Discussion

### A. The Claims Against Admiral

■■■■ The Complaint sets forth two bases for declaratory relief against Admiral: (1) that Admiral is liable under its policy to indemnify Yonkers in the amount of $1,180,-000 (Admiral's policy limit plus interest), and (2) that Yonkers in entitled to damages caused by Admiral's breach of its contractual obligation to defend and indemnify Yonkers in the original dispute in the amount of $1,480,000 (the remainder of the settlement in the Pierce action). Amen. Cpt. at ¶¶ 44, 57. Neither of these claims are legally sound. First, Yonkers concedes in the Complaint that Admiral paid its entire policy limit of $1,000,000, together with interest of $180,-000, towards satisfaction of the judgment entered against it. *Id.* at ¶ 37. Moreover, the terms of Admiral's insurance contract with Rice Mohawk, under which Yonkers is insured, limit the recovery for each bodily injury occurrence to $1,000,000.[8] *See* Adm.

8. With respect to the limits of liability, the Admiral policy provides:

 A. The limits of liability on the declarations are amended to read as follows:

Mem. at 4. New York courts have held that an insured party is bound by the recovery limits stated in the insurance policy. *See Champagne v. State Farm Mutual Auto. Ins. Co.,* 185 A.D.2d 835, 586 N.Y.S.2d 813, 816 (2d Dep't 1992) (citing *Rankin v. Travelers Inc. Co.,* 3 N.Y.S. 2d 444 (2d Dep't 1938)). In most situations, a court will utilize general contract principles to determine the terms of an insurance policy, giving unambiguous terms their plain and proper meaning. *See, e.g., Kurtin v. National Railroad Passenger Corp.,* 887 F.Supp. 676, 678 (S.D.N.Y.1995). Here, the limit of Admiral's policy is clearly stated as $1,000,000. Finally, both parties concede that Admiral has paid that limit in satisfaction of the judgment rendered against Yonkers in the Pierce action. As such, any claim by Yonkers for indemnification from Admiral in the amount of the insurance policy must be dismissed.

 Yonkers also claims a right to relief based on Admiral's breach of its duty to treat Yonkers fairly and in good faith with respect to the Pierce settlement. Again, Yonkers' claim is unfounded. As a general rule, a liability insurer who agrees to defend a suit against its insured has an obligation "to make good faith efforts [to defend the insured] within policy limits." *Forest Insurance, Ltd. v. American Motorists Insurance Company,* 89 Civ. 4326, 1994 WL 97138 at *9 (S.D.N.Y. March 21, 1994); *see also California Union Ins. Co. v. Excess Ins. Co. Ltd.,* 780 F.Supp. 1010, 1012 (S.D.N.Y.1991) (under New York law, an insurer must attempt to settle a claim in good faith where liability is clear and the potential for recovery may exceed the primary coverage limit) (citing *Young v. American Casualty Co.,* 416 F.2d 906, 910 (2d Cir.1969)). Moreover, in New York, an insurer's obligation to defend its insured is broader than its obligation to indemnify. *See Federal Insurance Co. v. Cablevision Systems Development Co.,* 836 F.2d 54, 56 (2d Cir.1987) (citing *Int'l Paper Co. v.*

*Continental Casualty Co.,* 35 N.Y.S.2d 332 (1974)). Therefore, Admiral owed Yonkers a duty of good faith even after it tendered its policy limit to the excess carrier and could not, as Yonkers states, "simply wash [its] hands of [its] potential exposure." Yonkers' Memorandum of Law in Opposition to Admiral's Motion to Dismiss ("Yonkers Mem.") at 3.

 This court recently articulated the bad faith standard in cases involving insurance carriers.

> The essence of a typical 'bad faith' claim is that a primary insurer having exclusive control over the settlement of a claim on behalf of its insured, in gross disregard for the interests of the policy holder, fails or refuses to negotiate in good faith a settlement within policy limits (or tender its full policy limits in a settlement) because it places its own financial self-interest ahead of its obligation to protect the interests of its policyholders.

*Forest,* 1994 WL 97138 at *11 (S.D.N.Y. Mar. 21, 1994). In order to establish a prima facie case of bad faith, a plaintiff must prove "gross disregard of the insured's interest" on the part of the insurer and a "deliberate or reckless failure to place on equal footing the interests of its insured with its own interests when considering a settlement offer." *Pavia v. State Farm Mutual Auto. Ins. Co.,* 82 N.Y.2d 445, 453, 605 N.Y.S.2d 208, 626 N.E.2d 24 ("bad faith" prosecution dismissed where defendant's conduct amounted to ordinary negligence).

In the case at hand, Yonkers' Complaint falls short of alleging any type of "gross disregard" or "reckless failure" on the part of Admiral regarding its defense in the Pierce matter. On the contrary, the Complaint concedes the numerous efforts made by Admiral, on behalf of Yonkers, to bring the Pierce matter to a close. *See* Amen. Cpt.

---

$1,000,000 each occurrence as respects bodily injury liability or property damages liability or both combined.
$1,000,000 aggregate…
The total liability of the Company for all damages, including damages for care and loss of services, because of bodily injury sustained by one or more persons as the result

of any one occurrence and the total liability of the Company for all damages because of all property damages sustained by one or more persons or organizations as a result of any one occurrence shall not exceed the limit of liability stated herein as applicable to 'each occurrence'.

*See* Adm. Mem. at 4.

at ¶¶ 25, 29. Further, Yonkers admits that throughout the entire Pierce dispute, Admiral agreed to and did control the defense of Yonkers in the underlying action. *Id.* at ¶ 33. In short, the Complaint provides no basis for the Court to conclude that Admiral ever breached its duty with regard to the Pierce lawsuit. As a result, Yonkers' claims against Admiral must be dismissed.

## B. The Claims Against Gen Star

■ There are two main prongs to Yonkers' argument for declaratory relief against Gen Star: (1) that Gen Star has breached its insurance contract and is liable under its policy to indemnify Yonkers in the amount of $1,480,000 (the amount of the judgment exceeding Admiral's policy limit), and (2) that Gen Star has breached its duty of good faith and fair dealing towards its insured causing Yonkers to sustain damages in the amount of $1,480,000. Amen. Cpt. at ¶¶ 61, 71. Gen Star, in turn, argues that Yonkers' claims should be dismissed as moot since there is no longer a case or controversy. According to Gen Star, the settlement of the underlying Pierce action by the four insurance carriers, without any contribution from Yonkers, rendered this action moot. *See* Gen Star Memorandum in Support of its Motion to Dismiss ("Gen Star Memo .") at 9.

Gen Star is correct in assuming that, as a general rule, the settlement of a dispute usually renders a case moot. *See ITT Rayonier Inc. v. United States,* 651 F.2d 343, 345 (5th Cir.1981) (settlement bars further litigation whether or not parties continue to disagree over particular issues). If, however, by the terms of the settlement, the insurers expressly reserve the right to reallocate their respective obligations to indemnify, a claim for indemnification by one insurer against the other insurance carriers is by no means moot.[9] *See Caulkins,* 931 F.2d at 749 (primary insurer was not entitled to indemnity from other insurers because it did not reserve its right when it agreed to settlement). Here, Yonkers claims that the payments made in connection with settling the Pierce action "were all made on a without prejudice basis with Yonkers, St. Paul, Landmark, and Gen Star, reserving their rights to obtain a declaration from this Court as to which parties had the obligation to indemnify Yonkers and in what amounts said indemnification was to be made."[10] Amen. Cpt. at ¶ 38. Accordingly, the Pierce settlement does not, in itself, render this dispute moot.

None of the cases cited by Gen Star support the proposition that a dispute between an insured and its insurer over the duty to indemnify is necessarily rendered moot upon settlement of the underlying claim.[11] In fact,

9. Gen Star claims that Yonkers, an insured in this matter, has no standing to sue because the real parties in interest are the insurers and not Yonkers. *See* Fed.R.Civ.P. 17(a) ("every action shall be prosecuted in the name of the real party in interest"). Yonkers, however, points out that it entered into an assignment agreement with St. Paul whereby St. Paul assigned to Yonkers the rights to sue for monies paid on its behalf by St. Paul. *See* Affidavit of Daniel O. Dietchweiler ("Dietchweiler Aff."), Attorney for Yonkers, at ¶ 17. In addition, the assignment agreement provides that "assignee [Yonkers] agrees to use all lawful means for the recovery of assignor's [St. Paul] payment in the Pierce matter and further agrees to refund assignor for any recovery of the money due or to become due from any third party . . . ." *Id.* at Exhibit B.

10. Gen Star claims that the settlement of the Pierce action was with prejudice and thus Yonkers cannot be held liable for any future damages arising from the Pierce action. *See* Gen Star Memo. at 8. While this is true as to the amount recovered by Pierce, the allocation of payment by each insurer was not finalized when the case

settled. Indeed, the parties reserved their rights to pursue the allocation issue following the settlement. *See Caulkins,* 931 F.2d at 749.

11. Gen Star also cites to *Caulkins,* 931 F.2d at 744. In that case, the Eleventh Circuit held that a settlement between the parties rendered moot any justiciable controversy because the insurer did not properly reserve its right to deny liability at the time it entered into the settlement. This is not the case here. Gen Star also cites *Farnum v. International Assoc. of Machinists,* 161 F.Supp. 391 (S.D.N.Y.1958). This case supports the proposition that at the moment of the settlement of a strike, an action for injunctive relief by a union employee becomes moot. The present action involves a different situation and a different type of relief. In addition, *Riordan v. Nationwide Mutual Fire Ins. Co.,* 984 F.2d 69 (2d Cir.1993), is mentioned, though that case concerns the issue of certification of a question to the New York Court of Appeals once a judgment has been satisfied by an insurer. Finally, Plaintiff relies on *Nautilus Ins. Co. v. Winchester Homes, Inc.,* 60 F.3d 824 (4th Cir.1995), which addressed the

*Western World Ins. Co. v. Cigna Corp.*, 718 F.Supp. 1518, 1519 (S.D.Fla.1989), cited by Gen Star, holds directly to the contrary. The *Western World* court dismissed a claim for indemnification against an insured, but concluded that, under a reservation of rights agreement, the insurer could maintain a suit against another insurer for indemnification and reimbursement in the underlying matter. Settlement in the underlying action does not eliminate Yonkers' right to recover from Gen Star.[12]

As noted earlier, in determining whether an actual controversy exists, a plaintiff must show that it personally suffered some actual injury as a result of the defendant's alleged conduct. *See Valley Forge*, 454 U.S. at 472, 102 S.Ct. 752. Gen Star claims that plaintiff suffered no damages because the insurance companies themselves settled the underlying action without any contribution from Yonkers. *See* Gen Star Memo. at 2. However, the Amended Complaint alleges a variety of damages suffered by plaintiff. For example, Yonkers asserts that it was required to pay the $500,000 self-insured retention fee in accordance with its policy with St. Paul. Amen. Cpt. at ¶ 39. In addition, Yonkers alleges damages in the form of the higher premiums that it must now pay to its present insurers as a result of their payment of losses in the Pierce matter. *See* Yonkers Memo. in Opp. to Gen Star at 4. If, as Yonkers contends, these losses should have been covered by Gen Star, then plaintiff has certainly suffered damages by Gen Star's refusal to pay the remaining sum following Admiral's payment.

 Finally, the Complaint asserts claims against Gen Star based on its bad faith and misleading efforts to settle the Pierce matter once it had accepted Admiral's tender of its policy limits. *See* Amen. Cpt. at ¶¶ 67–73. Specifically, Yonkers claims that it had "every right to believe that Admiral's tender to Gen Star would be handled in a competent and professional manner as respects the demands of plaintiff in the Pierce action," Mem. in Opp. to Gen Star at 6, and that Gen Star's subsequent inaction "lulled [Yonkers] into a false sense of security." *See* Dietchweiler Aff. at ¶ 19.

Yonkers is correct in its general assertion that every insurance contract contains a contractual duty of good faith owed by an insurer to its insured. *See* Insurance Law § 2601(a)(4) (McKinney's 1985). This doctrine, known as *uberrimae fidei*, entails the exercise of abundant good faith with absolute and perfect candor in an open and honest exercise of duties. In cases where the policy contains the standard provision requiring the insurer to attempt to negotiate a settlement, bad faith may well be evidenced by the carrier's failure to negotiate. *See Young v. Am. Cas. Co.*, 416 F.2d 906, 910 (2d Cir.1969). However, unlike the standard general liability policy, Gen Star's policy expressly limits the obligations of the excess insurer to investigate, defend or settle claims.[13] The issue, then, is whether an excess insurer, who has no duty to "settle" any claim, has a duty to act on behalf of its insured once the primary insurer has tendered, and the excess insurer accepted, the primary insurer's policy limits.

Yonkers concedes that Gen Star, "as excess carrier, did not have an independent duty to investigate, defend or settle the Pierce dispute." *See* Daniel O. Dietchweil-

---

mootness of an issue once the underlying litigation had been dismissed. It does not address the question of whether the reallocation of indemnity payments between multiple insurers is moot after a settlement. Furthermore, the Fourth Circuit has stated that reliance on an unpublished opinion, such as *Nautilus*, is strongly disfavored.

**12.** *Amherst & Clarence Ins. Co. v. Cazenovia Tavern Inc.*, 59 N.Y.2d 983, 466 N.Y.S.2d 660, 453 N.E.2d 1077 (1983), cited by Gen Star, is also distinguishable. In that case, the settlement rendered moot only the issue of whether or not the insurer had a duty to defend the insured. That case did not address the issue of indemnification by an insurer following a settlement.

**13.** Gen Star's policy contains the following language:

> The Company shall not be obligated to investigate, defend or settle any claim or suit against the Insured, but the company shall have the right and shall be given the opportunity to associate with the Insured or its underlying insurer, or both, in the investigation, defense or settlement of any claim or suit which, in the opinion of the Company, involves or appears reasonably to involve the Company.

*See* Gen Star Insurance Policy, Gen Star's Motion to Dismiss, Exhibit A.

ler's letter to the court ("Dietchweiller Letter"), dated July 9, 1998. However, according to Yonkers, the circumstances changed once Admiral tendered its underlying limit to Gen Star. *See id.* At that point, Yonkers alleges, Gen Star had an obligation to engage in settlement negotiations as part of its overall duty to act in good faith.

This issue cannot be fully addressed at this early stage of the litigation. As noted earlier, a court is required to accept all of plaintiff's allegations as true and indeed to draw every inference in plaintiff's favor. While plaintiff's allegations are general, even bordering on conclusory, they are sufficient at this stage to ward off dismissal. Yonkers is entitled to an opportunity to fully develop the record in order to determine what Gen Star was asked to do following Admiral's tender, what opportunities were presented to it and what actions the excess carrier actually took. Moreover, the contract language may be ambiguous, requiring the court to consider extrinsic evidence or to apply the duty of good faith and fair dealing to interpret the term "settle" in the clause on which Gen Star relies.[14] It may suggest that if an excess carrier is approached by a primary carrier and asked to share in a proposed settlement, the excess carrier has every right to decline. But the instant case presents a far different situation.

Here, the excess insurer did not merely decline an offer to settle. Instead, Gen Star accepted the full tender from the primary carrier and then took no reasonable efforts to protect the interests of its insured. Furthermore, Yonkers contends that "it was *agreed* that [Admiral] would tender to General Star, it being *understood* that good faith efforts would be made to utilize said funds to settle this claim." *See* Amen. Cpt., Exhibit I. According to Yonkers, Gen Star's representation that it would, in fact, make good faith efforts to settle this claim induced reliance on the part of Yonkers that its interest was being fully protected by Gen Star, who owed

it a duty to exercise the utmost good faith. As such, the general duty of good faith and fair dealing may indeed encompass a duty on the part of the excess insurer to protect the interests of its insured by all reasonable means, including full *consideration* of any bona fide settlement offers. If, after discovery, plaintiff cannot identify Gen Star's breach with sufficient specificity, a motion for summary judgment may be appropriate. At this time, however, dismissal of Yonkers' claims against Gen Star would be premature.

## IV. Conclusion

For the reasons stated above, Admiral's motion to dismiss all claims against it is granted, and Gen Star's motion to dismiss is denied.

SO ORDERED.

---

14. In a diversity action the court must apply the chosen forum's choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Gen Star correctly asserts that it is premature for the court to determine which state's law applies to the present

dispute. *See* Dietchweiller Letter at 1. Certainly, the applicable law will help guide the court in its interpretation of what duty, if any, was owed by Gen Star to Admiral upon tender of Admiral's policy limits.